UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NICOLE MOORE,

       Plaintiff,

       v.

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC. and PLANNED PARENTHOOD ACTION FUND, INC.

       Defendants.

Case No. 1:22-cv-08899 (AS)

---

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ARENTFOX SCHIFF LLP
Brian Farkas, Esq.
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
(212) 492-3297
brian.farkas@afslaw.com

Nancy J. Puleo, Esq. (*pro hac vice*)
800 Boylston Street, 32nd Floor
Boston, MA 02199
(617) 973-6124
nancy.puleo@afslaw.com

Alexandra M. Romero, Esq. (*pro hac vice*)
1717 K Street NW
Washington, DC 20006
(202) 828-3469
alexandra.romero@afslaw.com

*Attorneys for Defendants Planned Parenthood Federation of America, Inc. and Planned Parenthood Action Fund, Inc.*

## TABLE OF CONTENTS

Page

I. Moore concedes that she has abandoned her Title VII claims............................................ 2

II. No evidence supports Moore's discrimination claims....................................................... 2

    A. Plaintiff cannot state a prima facie case of discrimination without evidence of circumstances giving rise to an inference of discriminatory intent ................... 3

        1. There is no evidence of discriminatory animus by colleagues ................. 3

        2. Moreno no longer worked at PPFA when Moore was terminated and has no relevance to Moore's discrimination claim ............................ 5

        3. Moore was not replaced by a white man ..................................................... 6

    B. Moore cannot overcome significant evidence of PPFA's non-discriminatory reasons for terminating her ............................................................ 7

    C. There is no evidence to show that PPFA's legitimate reasons for terminating Moore were merely pretextual............................................................. 8

        1. Moore was not given "extra" work because of her race ........................... 8

III. No evidence supports Moore's retaliation claims................................................................ 9

CONCLUSION........................................................................................................................ 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abrams v. Dep't of Pub. Safety*,
 764 F.3d 244 (2d Cir. 2014).................................................................................................2

*Baguer v. Spanish Broad. Sys., Inc.*,
 No. 04 Civ. 8393, 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010), *aff'd*,
 423 F. App'x 102 (2d Cir. 2011) (.........................................................................................5

*Brown v. Syracuse*,
 673 F.3d 141 (2d Cir. 2012)..................................................................................................2

*Capak v. Epps*,
 662 F. Supp. 3d 463 (S.D.N.Y. 2023)...................................................................................2

*Deebs v. Alstom Transp., Inc.*,
 346 F. App'x 654 (2d Cir. 2009) ..........................................................................................1

*Dreni v. PrinterOn Am. Corp.*,
 No. 1:18-cv-12017, 2021 WL 4066635 (S.D.N.Y. Sept. 3, 2021) ........................................1

*Louis v. Brooklyn Botanic Garden*,
 No. 10-CV-5406, 2011 WL 3857127 (E.D.N.Y. Sept. 1, 2011), *aff'd sub nom.
 Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603 (2d Cir. 2012)..................................3

*Matias v. Montefiore Med. Ctr.*,
 No. 20-CV-2849, 2022 WL 4448585 (S.D.N.Y. Sept. 23, 2022)..........................................1

*Xu v. City of New York*,
 2020 WL 2088301 (S.D.N.Y. Apr. 30, 2020).......................................................................2

Moore cites no evidence that race played a role in her termination—or that she faced *any* adverse consequences at all because of her race. Instead, she offers an array of speculation. She *speculates* that her colleagues stereotyped her as an "angry Black woman." (Opp'n at 28.)[1] She *speculates* that she was "the type of Black woman [PPFA] did not want to work for them." (*Id*. at 31.) She *speculates* that three Latina women conspired to overwork her. (*Id*. at 24.) She *speculates* that any negative feedback from her supervisors "reflects their unlawful animus[.]" (*Id*. at 8.)

Defendants need not speculate. The Motion puts forth a mountain of evidence demonstrating Moore's failure to adequately perform her job. That evidence was heavily documented by her supervisors and colleagues for over a year. Moore tries to sweep that reality under the rug, painting legitimate criticisms of her work ethic, communications skills, and strategic thinking as racist attacks. She sees herself as a model employee. Indeed, the Opposition denies that Moore had *any* faults, and argues that any assertion to the contrary is purely pretextual.

A motion for summary judgment cannot be overcome by "'conclusory statements, conjecture, or speculation[.]" *Matias v. Montefiore Med. Ctr.*, No. 20-CV-2849, 2022 WL 4448585, at *14 (S.D.N.Y. Sept. 23, 2022) (citations omitted, collecting cases). Similarly, a plaintiff cannot create a dispute of material fact by relying solely on baseless assertions in her own self-serving declaration and deposition testimony where they are completely unsupported by the record. *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (holding that plaintiffs' self-serving deposition testimony that "plaintiffs rely almost exclusively upon" to support their claims "is insufficient to defeat summary judgment"); *Dreni v. PrinterOn Am. Corp.*, No. 1:18-cv-12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021) (same).

Here, the Opposition puts forth extensive speculation under the guise of factual disputes to

---

[1] Capitalized terms have the same meaning as defined in Defendants' Memorandum of Law. (ECF No. 67, "Mot.") References to Plaintiff's Memorandum of Law Opposition are in the form of "Opp'n at [page]." Pages are referenced by their PDF pagination on ECF.

1

suggest that the Court must ignore the straightforward reality: Moore was terminated because she was a very low-performing employee, and not because of her race. Countless of Moore's contentions are supported only by her own deposition testimony and self-serving declaration, despite other record evidence to the contrary. Summary judgment should be granted.

I.  **Moore concedes that she has abandoned her Title VII claims.**

The Motion argues that the Court should grant summary judgment on Moore's putative discrimination and retaliation claims under Title VII because Moore never amended her Complaint to add them following the issuance of the EEOC's Right to Sue Letter. (Mot. at 16.) The Opposition does not address Moore's failure to amend. "'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" *Capak v. Epps*, 662 F. Supp. 3d 463, 465 (S.D.N.Y. 2023) (quoting *Xu v. City of New York*, 2020 WL 2088301, at *4 (S.D.N.Y. Apr. 30, 2020). Thus, the Court should grant summary judgment on both putative Title VII claims.

II.  **No evidence supports Moore's discrimination claims.**

The Motion argues that summary judgment is warranted on Moore's remaining discrimination claims given the absence of issues of material fact. This is true because she fails at all three analytical levels of the *McDonnell Douglas* framework. At the first level, she cannot state a *prima facie* case because she cannot show that "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). At the second level, Defendants are able to show a "legitimate non-discriminatory reason [for the adverse employment] action[]"—namely, Moore's failure to adequately perform her job. *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251–52 (2d Cir. 2014). At the third level, Moore cannot show that a reasonable jury could conclude that Defendants' stated reasons are merely a pretext for unlawful discrimination. *Id*. In Opposition, Moore advances four

2

arguments. (Opp'n at 26–33.) Each is meritless.

> A. <u>Plaintiff cannot state a prima facie case of discrimination without evidence of circumstances giving rise to an inference of discriminatory intent.</u>
>
>> 1. <u>There is no evidence of discriminatory animus by colleagues.</u>

Moore argues that "[a]mple evidence exists to establish discriminatory animus by individuals involved in the decision to discipline and terminate Moore." (*Id*. at 27.) Critically, however, the only person who had the authority to "discipline and terminate Moore" was Newman. (SOF ¶ 6.) The Opposition cites *no evidence* that any other person had this authority. And the Opposition also cites *no evidence* that Newman (a Black woman) had any history of racial animus.

Instead, Moore points to scattered statements by non-decision-makers to argue that "an inference of racial stereotyping and animus" applies generally to PPFA. (Opp'n at 8, 28.) The Opposition cites various inflammatory language where PPFA employees wrote that Moore played the "race card," "weaponiz[ed] race," "bull[ied] the whites," and was "aggrieved." (Opp'n at 27–28.) These phrases may appear inflammatory on first blush. But on closer inspection of the underlying exhibits, it becomes apparent that they are red herrings because *none* of these statements was made by anyone who supervised, disciplined, or terminated Moore. *Louis v. Brooklyn Botanic Garden*, No. 10-CV-5406, 2011 WL 3857127, at *8 (E.D.N.Y. Sept. 1, 2011), *aff'd sub nom. Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603 (2d Cir. 2012) (holding that stray remarks from non-decisionmakers did not create a dispute of material fact as to whether discrimination motivated plaintiff's termination). Furthermore, the Opposition takes *all* of these statements dramatically out of context.

- In a Google Chat on January 19, 2021, Gault (a Black woman) jokes with Galloway (also a Black woman) "between us: I think that NM tries to low key bully the whites, lol[.]" (Farkas Decl. Ex. UU.) The context is Moore's mismanagement of Black History Month, which was discussed extensively in Defendants' Motion. (SOF ¶¶ 80–86.) Gault notes Moore's failure to copy critical team members on emails about planning. Galloway emphasizes Gault's statement that Moore is trying to "[b]ully them into doing the things

3

she is responsible for" and continues to say "I don't know if that is only for the whites lol I've seen it with everyone an[d] experienced it myself." (Farkas Decl. Ex. UU.) In other words, Galloway and Gault are discussing the fact that Moore is not doing her work; she is trying to bully others (white and non-white alike) into doing her work for her. Moreover, neither of them were responsible for the decision to discipline or terminate her. (SOF ¶¶ 45, 57, 64, 101; Newman: 176:5–8.)

- In a Google Chat on October 20, 2020, Bawol told Garcimonde-Fisher that she had "been very candid with [Gault] about the way [Moore] weaponizes race" and that Moore was "a toxic mess … AND plays the race card." Garcimonde-Fisher replied "totally." (Pierre-Louis Decl. Ex. 8.) The context, once again, was Moore's failure to perform her job. Garcimonde-Fisher noted that Gault "sees through the bullshit." (*Id.*) The Opposition omits Bawol's full quote: "[I]t is because she is a toxic mess who won't collaborate, brags constantly, acts immature and unprofessional, AND plays the race card." (*Id.*) Bawol and Garcimonde-Fisher are discussing significant problems with Moore's performance, and the ways in which she interacts with her colleagues. Still, neither Bawol nor Garcimonde-Fisher played any role in supervising, disciplining or terminating Moore. (SOF ¶¶ 45, 57, 64, 101; Newman: 176:5–8.)

- In an email dated December 10, 2020, to Galloway, Gault called Moore and Nicole Long "the most aggrieved Black women in the organization." (Farkas Decl., Ex. NN.) Gault (a Black woman) wrote this email to Galloway (another Black woman) about Moore and Nicole Long (also Black women). The Opposition omits the context for this phrase. Gault was describing Moore and Long's work on Black History Month. She wrote: "[Lauren Garcimonde-Fisher] is putting a ton of time into this, working with [Moore] and going through each element. But understandably, given the way she (and Nicole L) have shown up lately – as the most aggrieved Black women in this org – [Garcimonde-Fisher] is treading lightly to give them space. I know she has the same concerns I do about making [Black History Month] about [Planned Parenthood] and she has raised them, but at this point she is trying to simply help better articulate what they have come up with – as they are wedded to the idea that a reckoning is the way to go[.]" (*Id.*) In other words, Gault is explaining why she and others believe that Moore's ideas for Black History Month are poorly conceived and inappropriate for the observance. And she is observing that Garcimonde-Fisher is nevertheless trying to work with her to make it successful. Again, Gault did not supervise Moore and did not have a say in whether to discipline or terminate her. (SOF ¶¶ 45, 57, 64, 101; Newman: 176:5–8.)

In sum, the Opposition ties together phrases from non-decisionmakers that sound inflammatory when stripped from their context. Crucially, none of these statements were made by the people who took any adverse actions against Moore. Indeed, most of these phrases were said *by* Black women *to* other Black women. The Opposition's citation to de-contextualized phrases does not show any institutional animus.

4

### 2. Moreno no longer worked at PPFA when Moore was terminated and has no relevance to Moore's discrimination claim.

The Opposition focuses intensively on Rachel Moreno, painting her as Moore's primary antagonist at PPFA. Citing exclusively to her own Declaration, Moore claims that Moreno "repeatedly berat[ed] her, treat[ed] her worse than her white coworkers, and [spoke] in a condescending manner to her[.]" (Opp'n at 29.) The Opposition cites to other complaints by employees, two of which were anonymous, about Moreno to show that she harbored a deep racial animus. For multiple reasons, Moore's singular focus on Moreno is misguided.

*First*, it is important to place Moreno's role in its proper (and limited) context. Gamza was Moore's supervisor from January 2020 to November 2020 (eleven months). When Gamza was terminated, Moreno became Moore's supervisor between November 2020 and March 2021 (five months). (SOF ¶ 29.) From March 2021 through October 2021, Perez supervised Moore (eight months). (*Id.* ¶ 87.) Moreno then left PPFA in August 2021. (*Id.* ¶ 120.) After Moreno's departure, Moore was placed on the Final Written Warning in September 2021 and then terminated in October 2021. (*Id.* ¶ 101.) Newman was the ultimate decision-maker on Moore's PIP, Final Written Warning, and termination—*never* Moreno or Perez.[2] (*Id.* ¶¶ 45, 57, 64, 101; Newman: 176:5–8.) Put differently, Moreno was Moore's shortest-serving supervisor and had no power to terminate her. (SOF ¶ 122.)

*Second*, the Opposition obfuscates the undisputed fact, revealed by the timeline above, that

---

[2] The Motion explained why this Court should draw an inference against discrimination or retaliation given that Newman and Moore are both Black women. In opposition, Moore knocks down an argument that Defendants never made that "people in a protected category cannot discriminate against their fellow class members[.]" (Opp'n at 30) (quotations omitted). Defendants do not claim that a Black person can *never* discriminate against another Black person; merely that courts find that this circumstance is less likely, and hence employ a presumption against same-group discrimination. *Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393, 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010), *aff'd*, 423 F. App'x 102 (2d Cir. 2011) ("Courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the affected employee").

5

Moreno left PPFA *before* Moore was placed on a Final Written Warning and *before* Moore was terminated. Moreno therefore played *absolutely no role* in terminating Moore. (SOF ¶ 122.) After all, she did not work there when that decision was made. That decision was made by Newman. (Newman: 176:5–8.) Simply put, Moreno is a red herring in this Motion; whatever negative experience Moore allegedly had with Moreno cannot support a discrimination claim predicated on Moore's termination in October 2021 months after Moreno left PPFA.[3]

*Third*, Defendants deny that Moreno engaged in any conduct that gives rise to an inference of discrimination. Moore relies on exit interviews, two of which were anonymous, to suggest that Moreno harbors some sort of racial animus. There is no dispute that Moreno's management style sometimes clashed with PPFA's nonprofit culture. Newman testified that this approach was among the reasons that PPFA and Moreno ultimately parted ways in August 2021. (SOF ¶ 121.)

In sum, Moore clearly did not like Moreno, and Moreno, for her part, found Moore's work to be severely lacking across a wide range of metrics. But there is no factual dispute that Moreno never had termination authority, and indeed, did not even work at PPFA when the termination decision was made.

3. Moore was not replaced by a white man.

To support her argument that there is evidence of circumstances giving rise to an inference of discriminatory intent, Moore falsely claims that PPFA "replaced [her] with a white man following her termination." (Opp'n at 29.) Specifically, she claims that "[f]ollowing Moore's termination, Defendants hired a new Director of Marketing and Brand Engagement, Nathan

---

[3] It is true that Moreno was heavily involved with placing Moore on a PIP in November 2020. (SOF ¶ 57.) Moreno recommended that course of action, though it went through Human Resources and was ultimately approved by Newman. (*Id.*) But Moore was taken off that PIP in March 2021, and accordingly, did not suffer any damage from it. The fact that Moore was later placed on a Final Written Warning in September 2021 had nothing to do with Moreno. (SOF ¶ 101.) Moreno's conduct has no relationship to Moore's termination.

Engebretson, a white male, in the B&C department, who reported to Perez." (COF ¶ 133.)

Engebretson worked at a Planned Parenthood affiliate for nearly 20 years beginning in 2003. (Supp. Farkas Decl., Ex. IIII.) He was then hired to join PPFA in the Brand & Culture Department in or around May 2022, about six months after Moore was terminated. As Moore herself acknowledges, his title was "Director of Marketing and Brand Engagement" whereas her title was "Director of Multicultural Brand Engagement." It is true that he also reported to Perez, given that she ran the Brand & Culture Department. No evidence in the record supports the assertion that he replaced Moore. To the contrary, Perez testified that his title, scope, and experiences were completely different. (Perez: 147:22–148:24.) In sum, Engebretson's hiring so long after Moore's departure, in an entirely different role, has no bearing on this Motion.

  B. <u>Moore cannot overcome significant evidence of PPFA's non-discriminatory reasons for terminating her.</u>

The Motion put forth extensive evidence of Moore's abysmal performance in her role across a wide range of metrics: (1) Weak Strategic Thinking; (2) Minimal Work Product; (3) Late and Disorganized Work; and (4) Poor Interpersonal and Communication Skills. (SOF ¶¶ 45–108; Mot. at 19–24.) How does the Opposition address these issues? It doesn't. Moore largely denies that she had any performance problems at all. She makes two arguments to dispute her performance deficiencies.

*First*, she relies on a two-page, *undated* declaration from Gamza written in 2022. Gamza generally states that Moore did well early in her tenure but was undermined by Moreno. (ECF No. 81-2 ¶¶ 6–7.) Even if Gamza genuinely believed that Moore was a good employee, Gamza's judgment is hardly dispositive. Gamza herself had significant performance challenges and was terminated by PPFA in November 2020. (Newman: 28:9–15.) Moreover, Moore worked for PPFA for another year after Gamza's termination. Gamza has no knowledge about Moore's performance

7

for that entire period of time, and therefore cannot possibly know PPFA's reasons for placing her on the Final Written Warning in September 2021 or terminating her in October 2021.

*Second*, Moore continues to point to her "award" of "The Rock" as evidence that she was a high performing employee. (Opp'n at 13.) Defendants already explained that this "award" is not a formal recognition of anything. It is an informal peer-to-peer recognition that is not condoned or endorsed by PPFA. When Moore was given The Rock by her friend, multiple colleagues in the Division were appalled considering Moore's poor performance. (SOF ¶¶ 123–29.)

### C. There is no evidence to show that PPFA's legitimate reasons for terminating Moore were merely pretextual.

#### 1. Moore was not given "extra" work because of her race.

Moore argues that she was "treated disparately" because of her race because she was assigned an "untenable workload" of observances and was then "punished for failing to keep up." (Opp'n at 28.) There is certainly no dispute that Moore could not keep up with her workload—a defining characteristic of her tenure at PPFA. (SOF ¶ 104.) But contrary to Moore's repeated assertions, there is no evidence that PPFA gave her an excessive workload, nor any evidence that her workload was increased because of her race.

In Moore's Declaration in Opposition to Summary Judgment, she reiterates her complaints that she was assigned 11 observances. (ECF No. 81-1 ¶ 71.) Without context, perhaps this sounds like a high number. But it ignores three critical undisputed facts:

- Observances were part of her job. Her title was "Director of Multicultural Brand Engagement" and she herself admits that she "was responsible for growing Defendants' engagement with Black and Latinx audiences through programming and social media campaigns." (*Id*. ¶ 5.) It is unsurprising that she would be charged with leading efforts around observances, which are opportunities for multicultural engagement.

- Observances were not that much work. Essentially every witness in the Division confirmed that observances are generally light lifts. (*See, e.g.*, Moreno: 125:15–20.) Perez testified that they should have taken up no more than 25% of Moore's time. (Perez: 57:16–58:3.) Moore held a director-level role and earned over $120,000 annually; she should not have

8

felt so overwhelmed by 11 lightweight tasks.

- Moore's assertion that she was purposefully given more observances than others in the Division because of her race makes no sense. As numerous witnesses explained, the "big rock" observances were assigned to Garcimonde-Fisher's team, and the "small rock" and "medium rock" observances were assigned to Perez's team. (*See, e.g.*, Garcimonde-Fisher: 129:8–17.) The "small rock" and "medium rock" observances were then split evenly between Moore and Melissa Lopez (who is Latina), two of the three members of Perez's team (the third was Gabrielle Stopper, who was not in a project management role). (*Id.* 94:17–21; Perez: 92:18–93:2.) Moore did not even have to draft any observance briefs—the most time-consuming part of each observance—because Lopez had drafted them all the year before. (Perez: 57:16–58:3.)

As such, Moore's claim that Defendants "tokenized" her by assigning her to work on all of PPFA's Black observances is nonsensical. (Opp'n at 14.) As an initial matter, there is no evidence in the record that Moore was actually assigned all Black observances other than her own self-serving statements. More importantly, Moore was not assigned to work on some Black observances because she was Black—she was assigned to work on Black observances, along with observances related to other identity groups (like Transgender Day of Remembrance) because, by her own admission, *it was her job* to "grow[ ] Defendants' engagement with Black and Latinx audiences." (ECF No. 81-1 ¶ 5.)

In sum, no evidence supports Moore's repeated insistence that she was overworked or tokenized, and there is certainly no evidence that her workload was increased because of her race.

### III.   No evidence supports Moore's retaliation claims.

Moore's retaliation claims cannot survive for the same reasons detailed in the Motion: she has no evidence of causation required to state a *prima facie* case, and also no facts to overcome PPFA's legitimate and non-retaliatory reasons for taking adverse action.

Moore makes several arguments in support of her claim that the evidence in this case reveals "retaliatory animus." (Opp'n at 20.) Each is unavailing.

*First*, Moore claims that Moreno and Newman both verbally reprimanded Moore for

9

making a September 2020 complaint about the lack of Black ownership of observances. (*Id.* at 13.) However, the only evidence she cites in support of this claim is her own self-serving declaration and deposition testimony, which is insufficient to create a dispute of fact. (ECF No. 82 ¶ 13.)

*Second*, Moore claims that Bawol accused Moore of "weaponizing her race." (Opp'n at 20.) This is irrelevant. Bawol played no role in any decision with respect to Moore's employment, and Moore does not assert that she did. Moreover, the Opposition strips this phrase from its full context, as explained above.

*Third*, Moore claims that Garcimonde-Fisher and Gault objected to "Moore's 'big statements' regarding racism in the workplace . . . to 'avoid accountability.'" (*Id.* at 20.) Again, this is irrelevant. Garcimonde-Fisher and Gault played no role in any decision with respect to Moore's employment. (Gault: 190:24–192:19; Perez: 126:3–10; Newman: 77:3–78:13, 178:5–11, 204:21–205:1.)

*Fourth*, Moore claims that "Perez, Gault, and Garcimonde-Fisher concocted 'a Plan' to engineer Moore's termination" following her August 2021 complaint regarding "tokenization." (Opp'n at 13–14.) However, Gault and Garcimonde-Fisher were not decisionmakers, and Perez's objection was that Moore refused to do work squarely within her job description as a Director of Multicultural Engagement; even Moore admits that her role required her to "increase[e] [PPFA's] engagement with Black and Latinx audiences." (ECF No. 1 ¶ 19.)

*Fifth*, Moore claims that Perez emailed Newman and Galloway "characterizing Moore as 'poisoning the well.'" (Opp'n at 14.) Here, the record evidence shows that Perez was simply objecting to Moore's refusal to perform core elements of her job.

## **CONCLUSION**

For these reasons, and those explained in the moving papers, Defendants respectfully request that the Court grant summary judgment in their favor and dismiss this action in its entirety.

Dated:   July 2, 2024
         New York, New York

ARENTFOX SCHIFF LLP

*/s/ Brian Farkas*
Brian Farkas
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
(212) 492-3297
brian.farkas@afslaw.com

Nancy J. Puleo, Esq. (pro hac vice)
800 Boylston Street, 32nd Floor
Boston, MA 02199
(617) 973-6124
nancy.puleo@afslaw.com

Alexandra M. Romero, Esq. (pro hac vice)
1717 K Street NW
Washington, DC 20006
(202) 828-3469
alexandra.romero@afslaw.com

*Attorneys for Defendants Planned Parenthood Federation of America, Inc. and Planned Parenthood Action Fund, Inc.*