**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NICOLE MOORE,

              Plaintiff,

      v.

PLANNED PARENTHOOD FEDERATION OF
AMERICA, INC. and PLANNED PARENTHOOD
ACTION FUND, INC.

           Defendants.

Case No. No. 1:22-cv-08899 (AS)

---

## DEFENDANTS' RESPONSE TO PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS AND "ADDITIONAL FACTS"

---

ARENTFOX SCHIFF LLP
Brian Farkas, Esq.
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
(212) 492-3297
brian.farkas@afslaw.com

Nancy J. Puleo, Esq. (*pro hac vice*)
800 Boylston Street, 32nd Floor
Boston, MA 02199
(617) 973-6124
nancy.puleo@afslaw.com

Alexandra M. Romero, Esq. (*pro hac vice*)
1717 K Street NW
Washington, DC 20006
(202) 828-3469
alexandra.romero@afslaw.com

*Attorneys for Defendants Planned Parenthood Federation of America, Inc. and Planned Parenthood Action Fund, Inc.*

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1, Defendants Planned Parenthood Federation of America, Inc. ("PPFA") and Planned Parenthood Action Fund, Inc. ("PPAF") (collectively, "Defendants") submit this Response to Plaintiff's Additional Statement of Material Facts submitted as part of Plaintiff's Opposition to Defendants' Motion for Summary Judgment. (ECF No. 82, the "Additional Facts").[1] Each Additional Fact is restated, followed by Defendants' Response together with citation to relevant record evidence.[2]

1.      On January 13, 2020, Moore commenced her employment with Defendants as the Director of Multicultural Brand Engagement. Ex. T.

> **RESPONSE:** This fact is partially disputed to the extent it uses the plural, "Defendants." Moore commenced her employment with PPFA on January 13, 2020. She was never employed by PPAF. Plaintiff cites to Exhibit T, which is Moore's Offer Letter. That document references *only* PPFA. (Farkas Decl., Ex. T.)

2.      Moore reported to Ilana Gamza, the Senior Director of Brand Marketing. Ex. 1 ⁋ 6.

> **RESPONSE:** This fact is admitted. For clarity, between January 2020 and November 2020, Moore reported to Gamza who reported to Moreno who reported to Newman. Between November 2020 and March 2021, Moore reported to Moreno who reported to Newman. Between March 2021 and her termination in October 2021, Moore reported to Perez who reported to Newman. Newman is the only person who ever had authority to discipline or terminate Moore. (Newman: 9:2–11; 11:19-12:3; Galloway: 17:14–16; Complaint at ¶ 18 n.1; Beckett: 173: 18–19.)

---

[1] With respect to Moore's Counterstatement of Material Facts, Defendants note that many of the entries are improper as they include argument or legal conclusions rather than pure factual statements. "Rule 56.1 statements are not argument and must contain factual assertions with citation to the record rather than conclusions." *Guillen v. City of New York*, No. 19 Civ. 5655, 2022 WL 4072925, at *1 (S.D.N.Y. Sept. 2, 2022) (quoting *Pacenza v. IBM Corp.*, No. 04 Civ. 5831, 2007 WL 9817926, at *4 (S.D.N.Y. July 26, 2007); *see also*, *Alliance Sec. Prods., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) ("legal arguments . . . belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact").

[2] Citations are made to the Farkas Declaration in Support of Defendants' Motion for Summary Judgment (ECF No. 64, "Farkas Decl."), which attaches **Exhibits A-CCCCC**. The first eleven exhibits are deposition transcripts: Rachel Moreno (**Exhibit A**); Charise Beckett (**Exhibit B**); Jamila Galloway (**Exhibit C**); Nicole Moore (**Exhibit D**); Elizabeth Bawol (**Exhibit E**); Melanie Newman (**Exhibit F**); Lauren Garcimonde-Fisher (**Exhibit G**); Sandra Perez (**Exhibit H**); Ylonda Gault (**Exhibit I**); Dannette Hill (**Exhibit J**); and Steven Manley (**Exhibit K**). Ten of these are fact witnesses; Manley is Defendants' Rule 30(b)(6) witness. Citations to the deposition transcripts are formatted as: Last Name: [Page]:[Line]-[Line]. Citations are also made to the Supplemental Farkas Declaration in Further Support of Defendants' Motion for Summary Judgment ("Supp. Farkas Decl."), which attaches **Exhibits DDDDD - IIIII**.

3.      Gamza reported to Rachel Moreno the Vice President of Brand & Culture ("B&C"), who reported to Melanie Newman, the Senior Vice President of Communications and Culture ("CNC"). Ex. 1 at ⁋ 6.

**RESPONSE:** This fact is admitted. *See* Response to Additional Fact No. 2.

4.      From the beginning of Moore's employment, she "was a self-starter who hit the ground running by networking, building out creative new programs and managing complex projects with tremendous aplomb while deftly navigating Planned Parenthood's very complex organization with impressive comprehension." Ex. 2 at ⁋ 6.[3]

> **RESPONSE:** This fact is disputed. Moore's performance was deeply deficient across a wide variety of metrics throughout her tenure, as explained in great detail in the Motion. (*See* Farkas Decl., Exs. V, W, X, Y, BB, CC, DD, EE, FF, GG, HH, II, JJ, KK, MM, NN, OO, PP, QQ, RR, TT, VV, WW, XX, YY, ZZ, AAA, BBB, CCC, DDD, EEE, FFF, GGG, HHH, III, LLL, MMM, PPP, QQQ, TTT, VVV, WWW, YYY, ZZZ, AAAA, BBBB, CCCC, DDDD, EEEE, HHHH, IIII, JJJJ, KKKK, LLLL, MMM, NNNN, PPPP, and CCCCC.)

5.      Several employees, including Newman, informed Moore that Moreno had a history of unprofessionalism and racism at Planned Parenthood. Ex. D at 54:24-55:22.

> **RESPONSE:** This fact is disputed. *First*, it is unclear what is meant by a "history of unprofessionalism." This assertion is too vague for Defendants to respond. *Second*, Moore cites only to her own deposition as evidence for the proposition that Newman told her that Moreno was racist. Newman herself never testified to telling Moore this information, and nothing else in the record supports this conclusion. To the contrary, Newman testified that no one other than Moore had raised any concerns related to race about Moreno. (Newman: 29:14–17.) Moore cannot rely solely on her own self-serving deposition testimony to create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

6.      From the start of Moore's employment, Moreno positioned herself against Moore and treated her with open contempt, unfounded suspicion, and addressed her in a tone so withering and condescending it made others uncomfortable. Ex. 2 at ⁋⁋ 7-8; Ex. D at 60:14-25-61:1-9.

> **RESPONSE:** This fact is disputed. This assertion is not a "fact" but rather Moore's subjective assessment of Moreno's tone or demeanor.

---

[3] Defendants note that Exhibit 2, a Declaration purportedly executed by Ilana Gamza, is undated.

7.      In an early interaction between Moore and Moreno, Moreno derisively criticized

Planned Parenthood's "Stand with Black Women" campaign. Ex. D at 58:23-59:18. Ex. 1 at ¶ 15.

> **RESPONSE:** This fact is disputed. Moore cites only to her own deposition and Declaration
> as evidence that Moreno offered this criticism of the initiative, and nothing else in the
> record supports this conclusion. Moore cannot rely solely on her own self-serving
> deposition testimony and Declaration to create a triable issue of fact where it is entirely
> unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL
> 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

8.      Moore found Moreno's criticism of Planned Parenthood's "Stand with Black

Women" campaign insulting as a Black woman. Ex. D at 58:23-59:18. Ex. 1 at ¶ 15.

> **RESPONSE:** This fact is disputed. This assertion is not a "fact" but rather Moore's
> subjective feeling about Moreno's alleged criticism of a specific initiative. Moore cites
> only to her own Declaration and deposition testimony as evidence, and there is nothing else
> in the record that supports the notion that Moreno criticized this initiative at all, let alone
> in an "insulting" manner.  Moore cannot rely solely on her own self-serving Declaration
> and deposition testimony to create a triable issue of fact where it is entirely unsupported
> by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13
> (S.D.N.Y. Sept. 3, 2021).

9.      Moreno did not voice similar issues with Planned Parenthood's campaigns aimed

at or that ultimately reached white women or women of other racial backgrounds in the same way

she did with the "Stand with Black Women" campaign. Ex. 1 at ¶¶ 15-16.

> **RESPONSE:** This fact is disputed. Moore cites only to her own Declaration for the
> proposition that Moreno did not criticize initiatives aimed at "white women or women of
> other racial backgrounds[.]" Moore would not have personal knowledge of the many
> different initiatives and campaigns on which Moreno worked, or offered opinions.
> Therefore, Moore cannot assert that Moreno never criticized initiatives or campaigns that
> were targeted at non-Black populations. No evidence in the record supports this assertion.
> Moore cannot rely solely on her own self-serving Declaration to create a triable issue of
> fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18
> Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

10.     Moreno regularly criticized the Stand with Black Women campaign throughout the

remainder of Moore's employment. Ex. 1 at ¶ 17.

**RESPONSE:** This fact is disputed. Moore cites only to her own Declaration as evidence, and nothing else in the record supports the notion that Moreno criticized this initiative. Moore cannot rely solely on her own self-serving Declaration to create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

11.     Moreno required weekly one-on-one meetings with Moore from the start, which she did not require from her other indirect reports. Ex. A at 78:10-14. Ex. 1 at ⁋⁋ 7-8.

**RESPONSE:** This fact is disputed. Moreno testified that she held weekly one-on-one meetings with her direct reports. She also testified that "at this time" (i.e., October 2020), she held regular meetings with indirect reports, but those meetings were "[n]ot weekly." She met more frequently with Moore because Gamza, Moore's first supervisor, had significant performance challenges herself: "[T]here were no other members of the team that had a manager who had a practice of poor performance and performance issues as Ilana [Gamza] did, which was why I was stepping in and providing some more leadership [to Moore]." (Moreno: 78:7–79:25.)

12.     These meetings took up Moore's time and prevented her from working productively during her business hours in the way her non-Black peers were able. Ex. 1 at ⁋ 10.

**RESPONSE:** This fact is disputed. It is hardly uncommon for an employee to have regular meetings with a supervisor. That is particularly true when an employee is struggling. Indeed, Moreno had these meetings with direct and indirect reports regularly. They were necessary for Moore for two reasons: first, Moore's own supervisor (Gamza) was a poor manager; and second, because Moore herself had performance challenges. (Moreno: 78:7–79:25.) Defendants therefore dispute the assertion that these meetings "took up Moore's time" or somehow negatively impacted her work.

13.     About a month into Moore's tenure, Moreno approached Moore in an open hallway and loudly berated her in front of approximately ten of her coworkers. Ex. D at 58:23-59:18; Ex. 1 at ⁋ 19.

**RESPONSE:** This fact is disputed. Moore cites only to her own Declaration and deposition testimony as evidence, and there is nothing else in the record that supports the notion that Moreno "loudly berated" Moore in an open hallway. Moreover, none of the alleged ten coworkers who witnessed this altercation have supplied any testimony or evidence in this litigation that would support this assertion. Moore cannot rely solely on her own self-serving Declaration and deposition testimony to create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

4

14.     Moore complained about Moreno's public beratement to her supervisor, Senior Director, Brand Marketing, Ilana Gamza. Ex. 2 at ⁋ 9; Ex. 1 at ⁋ 20.

**RESPONSE:** This fact is disputed. *See* Response to Additional Fact No. 13.

15.     Gamza was uncomfortable that Moreno demonstrated an unwarranted mistreatment against Moore. Ex. 2 at ⁋ 10.

**RESPONSE:** This fact is disputed. This assertion is not a "fact" but rather Gamza's subjective feeling about her alleged observations. Beyond Gamza's Declaration, no evidence in the record supports the notion that she felt "uncomfortable" about the way that Moreno treated Moore. For example, nothing in the record suggests that Gamza ever filed a complaint or report with Human Resources, nor that she complained to Newman (who oversaw the division and was Moreno's supervisor).

16.     Gamza escalated Moore's complaint about Moreno's public beratement to Moreno and attempted to foster a more productive relationship between the two of them. Ex. 2 at ⁋ 9; Ex. 1 at ⁋ 20.

**RESPONSE:** This fact is disputed. Beyond Gamza's Declaration, no evidence in the record supports the notion that she "escalated Moore's complaint about Moreno's public beratement to Moreno[.]" For example, nothing in the record suggests that Gamza ever filed a complaint or report with Human Resources, nor that she complained to Newman (who oversaw the Division and was Moreno's supervisor).

17.     Moreno's behavior did not change following Gamza's attempts to foster a more productive working relationship between Moreno and Moore. Ex. 2 at ⁋ 9; Ex. 1 at ⁋ 20.

**RESPONSE:** This fact is disputed. Defendants deny all premises of these assertions, namely that any aspect of Moreno's behavior towards Moore needed to "change" or that Gamza ever asked Moreno to make unspecified changes in this regard. Moreno testified that she "wanted to give Nicole more of a chance to succeed in the role" and did everything possible to support her. (Moreno: 104:4–14.)

18.     Moore complained about Moreno's scolding behavior to Newman, and Newman responded that she had fielded similar complaints against Moreno and that Moreno had regular conflicts with "Black" staff. Ex. D at 60:2-13. Ex. 1 at ⁋ 21.

**RESPONSE:** This fact is disputed. Beyond Moore's own Declaration and deposition testimony, nothing in the record supports the assertion that she ever "complained" about Moreno to Newman. Nothing in the record supports the assertion that Moreno "had regular conflicts with 'Black' staff." Instead, the record shows that Moreno had high standards for those in her Department, and that her style of management sometimes created stress; but nothing about that quality was race-based. In fact, Newman explicitly testified that she was not aware of any race-related complaints against Moreno. (Newman: 29:3–17.) Moore cannot rely solely on her own self-serving Declaration and deposition testimony to create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

19.     Newman did not intervene or escalate Moore's complaint to Defendants' Human

Resources ("HR"). Ex. F at 171:3-7;171:18-171:4. Ex. 1 at ⁋ 22.

**RESPONSE:** This fact is disputed. Defendants deny the underlying premise of this assertion, namely that Moore ever made a "complaint" about Moreno to Newman in the first place. The portions of Newman's deposition transcript cited here (Ex. F) do not support Moore's contention that Newman failed to escalate a complaint she made about Moreno, as that portion of the transcript discusses Newman's reaction to an email that Moore sent in September 2021, after Moreno had left PPFA. (Newman: 168:13–172:11.) Beyond Moore's own statements in her Declaration, no evidence in the record supports that fact. Newman could not "intervene or escalate" in a "complaint" that was never made to her. Moore cannot rely solely on her own self-serving Declaration to create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

20.     Moreno unfairly attributed Moore's ideas to her Moore's coworkers and would

praise Moore's white colleagues for her ideas. Ex. 1 at ⁋ 27.

**RESPONSE:** This fact is disputed. Moore cites only to her own Declaration as evidence, and there is nothing else in the record that supports the notion that Moreno attributed Moore's work to coworkers, or praised "white colleagues" for Moore's ideas. By contrast, there is a mountain of evidence that Moore was a poor performer who failed to produce good ideas that would have merited her supervisor's praise. (Farkas Decl., Exs. V, W, X, Y, BB, CC, DD, EE, FF, GG, HH, II, JJ, KK, MM, NN, OO, PP, QQ, RR, TT, VV, WW, XX, YY, ZZ, AAA, BBB, CCC, DDD, EEE, FFF, GGG, HHH, III, LLL, MMM, PPP, QQQ, TTT, VVV, WWW, YYY, ZZZ, AAAA, BBBB, CCCC, DDDD, EEEE, HHHH, IIII, JJJJ, KKKK, LLLL, MMMM, NNNN, PPPP, and CCCCC.) Moore cites only her own self-serving Declaration, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

21.   From approximately March 2020 to May 2020, Moore developed a marketing campaign for Defendant's national telehealth program, which required her to work 10 to 12 hours per day. Ex. 1 at ¶¶ 26-27.

**RESPONSE:** This fact is disputed. It is true that Moore worked on PPFA's national telehealth campaign, as did most Brand and Culture employees during the early days of the pandemic. However, Perry Meyers was assigned the role of project manager of the telehealth program from the start, who was responsible for directing all aspects of PPFA's telehealth work. (Supp. Farkas Decl., Ex. DDDDD.) Further, there is no support in the record, beyond Moore's own statements in her Declaration, that her work on the telehealth campaign would have required "10 to 12 hours per day" during that three-month period. Moore cannot rely solely on her own self-serving Declaration to create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

22.   On May 5, 2020, Vice President of Brand and Culture Strategy, Lauren Garcimonde-Fisher requested that Senior Creative Director, Elizabeth Bawol, send her a performance critique about Moore by email to create a "paper trail." Ex. 4.

**RESPONSE:** This answer is disputed. *First*, Exhibit 4 is a Google Chat dated May 26, 2020 (not May 5, 2020). *Second*, at the time of this Google Chat, Garcimonde-Fisher did not "request" that Bawol send her a "paper trail"; rather, Bawol was independently expressing concerns about Moore's comments and ideas in meetings. *Third*, Defendants dispute any insinuation that there is something nefarious about ensuring that there is a "paper trail" of an employee's significant performance deficiencies. Maintaining contemporaneous records can prove useful, and indeed, in Moore's case, concerns about her performance were heavily documented and incorporated into her Performance Improvement Plan and Final Written Warning. (Farkas Decl., Exs. JJ, KK, LLLL.)

23.   On May 5, 2020, Bawol informed Garcimonde-Fisher she sent "the paper trail / email to [Gamza] too" per Moreno's request. *Id.*

**RESPONSE:** This fact is admitted to the extent that Defendants do not dispute that Bawol sent concerns about Moore's comments, ideas, and performance to Moreno and Gamza on May 5, 2020.

24.   In June 2020, Moreno vetoed Gamza's decision to select Moore for a leadership role, and Moore's white coworker, Director of Brands Strategy and Projects, Perry Meyers,

received it instead, despite Meyers being neither more experienced nor qualified than Moore for the role. Ex. D at 90:2-91:2; 116:21-24; Ex. 1 at ¶ 30.

> **RESPONSE:** This fact is disputed. Moore testified at deposition that the "leadership role" she referenced here involved work on PPFA's telehealth campaign, and she stated that Moreno responded to an email "saying that she did not want [Moore] to lead and that she was appointing Perry Meyers for this role." (Moore: 90:7–14.) That email exchange occurred on April 20, 2020, and in reality, Moreno simply stated that Perry Meyers had been responsible for all aspects of the telehealth campaign *from its start*. (Supp. Farkas Decl., Ex. DDDDD.) Specifically, Moreno stated: "Just want to make sure we are all aligned. Also adding in Perry who NEEDS to be across everything telehealth as she is the project manager on telehealth." (*Id.*) Moore relies only on her own deposition testimony and Declaration to support her claim that she was "removed from a leadership role," which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

25.     On June 30, 2020, Gamza and Moreno met with Moore and approved her budget for the upcoming fiscal year, which was due for submission the following day. Ex. D at 91:17-93:10.

> **RESPONSE:** This fact is disputed. Moore relies only on her own deposition testimony to support her claim, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

26.     On June 31, 2020, Moreno instructed Moore to make substantial cuts to her budget by the end of the workday. Ex. D at 91:17-93:10.

> **RESPONSE:** This fact is disputed. *First*, there is no such date as "June 31." *Second*, this assertion, which Moore takes entirely from her own deposition testimony, is contradicted by Moreno's explanation of Moore's budgetary failures: "Nicole had not delivered a strategy and had not delivered a plan for -- a clear plan for the budget that was associated that was allocated to her work. [At the end] of the fiscal year[,] the organization was under tremendous budgetary, you know, constraints, as I think every business and organization in the world was in response to the pandemic. And it was the end of the fiscal year, and because she didn't provide a strategy or who had delivered late plans, there was a budget that was left on the table that we weren't able to spend and essentially mismanaged the budget at that time. And we were given a mandate from the finance team that you either use it or you lose it during that period." (Moreno: 73:20–74:14.) In other words, Moreno did not suddenly order Moore to make substantial budget cuts out of the clear blue sky. The organization overall was adjusting budgets in light of the COVID-19 pandemic, and Moore

had continually delivered "late plans," meaning that she left budget unspent at the end of the fiscal year that she would subsequently lose for failing to use it. (Garcimonde-Fisher: 105:23–107:15.) Garcimonde-Fisher's deposition testimony is consistent with that of Moreno. (*Id.*) Moore relies only on her own deposition testimony to support her claim, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

27.     Moore believed Moreno's demand that she cut her budget was racist because: (1) Moreno's disparate, and better, treatment to Moore's white coworkers; (2) Moreno's consistent hostility against Moore; and (3) Gamza indicated no other employers received a similar instruction to cut their budget. Ex. 1 at ¶¶ 33-37.

> **RESPONSE:** This fact is disputed. *First*, regardless of what Gamza "may have indicated," multiple witnesses testified at deposition that all parts of PPFA's organization were asked to cut their budget, as most organizations had to do in response to the pandemic. (Moreno: 73:20–74:14; Garcimonde-Fisher: 106:17–25.) *Second*, multiple witnesses testified that Moore was not even asked to cut her budget—she was asked to use existing budget before the end of fiscal year that she had not yet used due to her mismanagement, otherwise she would lose it pursuant to PPFA's general policies. (Moreno: 73:20–74:14; Garcimonde-Fisher: 105:23–107:15.) No evidence in the record, beyond Moore's own Declaration, supports the assertion that Moreno treated white coworkers "better" than non-white co-workers. And, Moore's Declaration cannot create a triable issue of fact where it is wholly unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

28.     PPFA held monthly "CNC Black Staff" meetings where Black staff were encouraged to attend and discuss George Floyd's murder, as well as other issues of race and racism in and outside of Planned Parenthood. Ex. F at 198:5-12. Ex. 1 at ¶ 34.

> **RESPONSE:** This fact is admitted, except to clarify that the referenced meetings were optional for employees to attend and intended as supportive spaces during a challenging time for the United States.

29.     Newman created "CNC Black Staff" and regularly attended. Ex. F at 198:13-199:2.

> **RESPONSE:** This fact is admitted.

30.     On June 31, 2020, Moore attended a "CNC Black Staff" meeting, which Newman urged was a "safe space" for Black employees to raise concerns. Moore tearfully complained to

Newman that she believed the cut was motivated by "racist" intent (hereinafter, the "June 2020

Complaint"). Ex. D at 123:25-124:5; Ex. 1 at ¶¶ 33-37.

>**RESPONSE:** This fact is disputed. *First*, there is no such date as "June 31." *Second*, although Defendants do not dispute that Communications & Culture ("CNC") Black Staff meetings were safe spaces for employees to speak and raise concerns, Defendants deny that Moore described Moreno or the budget cuts as "racist" during the referenced meeting." (Newman: 30:13–18.) Moore cites only to her self-serving Declaration and deposition testimony to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

31.    Newman raised Moore's complaint to Moreno about the cut to her budget, which

Moreno denied. *Id.*

>**RESPONSE:** This fact is disputed. Newman testified at deposition that Moore was simply incorrect that her budget was ever cut, stating: "I believe Nicole Moore had suggested that her budget was cut . . . which meant that Planned Parenthood and Rachel didn't care about black audiences. It wasn't true. It wasn't based on truth. It wasn't a full reflection of the budget for the division, how the budget decisions were made or how the budget was allocated. And at the director level, an employee is expected to have an understanding of the tough decisions made in the budget process, how the budget gets to final, and a reflection of the entire budget." (Newman: 142:1–15.) Moore cites only to her own self-serving Declaration and deposition testimony to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

32.    Moreno called Moore screaming and told her that the June 2020 Complaint created

"chaos and confusion." Ex. D at 113:5-17; Ex. A at 159:14-21.

>**RESPONSE:** This fact is disputed. No evidence in the record, beyond Moore's own deposition testimony, supports the assertion that Moreno ever called her "screaming." Rather, the cited portion of Moreno's deposition reveals that Moreno expressed that it was "inappropriate [for Moore] to make a swooping assumption without the data that caused confusion and, you know, especially because it is untrue and I think that is irresponsible . . . . [I]t provides a good example of areas of performance challenges and concerns." (Moreno: 159:14–25.) In other words, Moore should not spread falsehoods about being "forced to cut her budget" for "racist" reasons in public meetings, when she was not forced to cut her budget—she was told that because she had failed to spend her existing budget, she would lose it for the next fiscal year. Moore cites only to her own self-serving Declaration and deposition testimony to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

33.     Moreno instructed Gamza to send Moore a negative performance critique in order to support disciplinary action against Moore, which made Gamza uncomfortable. Ex. 2 at ‖‖ 11-12.

> **RESPONSE:** This fact is disputed. *First*, Moreno testified that she did not recall Gamza ever disagreeing with her negative assessment of Moore's performance. (Moreno: 81:20–22.) *Second*, Moreno further testified that she never drafted emails for Gamza or told Gamza to provide negative performance critiques to Moore. (*Id.* at 82:2–3.) Rather, she merely stated that she would provide Gamza with "input on communications, whether it was external communications or internal communications," which was "common practice . . . on a communications team[.]" (*Id.* at 81:24-82:19.)

34.     Over Gamza's repeated objections, Moreno ghost-wrote a negative performance critique under Gamza's name and demanded that she send it to Moore as though she had written it herself. Ex. 2 at ‖‖ 12-14.

> **RESPONSE:** This fact is disputed. Moreno never "ghost-wrote" negative performance reviews about Moore under Gamza's name, nor did she demand that Gamza send such reviews to Moore. *See* Response to Additional Fact No. 33.

35.     On July 29, 2020, Moreno instructed Bawol to send a negative critique about Moore by email to Managing Director for Communication and Culture, Jamila Galloway, and Moreno regarding concerns raised by Moore and other employees about confusing processes. Ex. 5.

> **RESPONSE:** This fact is disputed. It appears to take Exhibit 5 dramatically out of context. Exhibit 5 is a Google Chat between Bawol and Moreno. Bawol wrote that Moore had "complained about the 'house' visual on [a] call (with lots of folks) about how confusing it is . . . . Just wanted you to be aware. I wonder if (since so many questions are coming from our team) we should have a [Division] meeting to answer more questions. just a thought." Moreno responds: "[I]f you can send me an email and add Jamila [Galloway] that would be great[.]" In other words, Moreno did not instruct Bawol to "send a negative critique about Moore by email" to Galloway. Rather, she was asking Bawol to send her an email memorializing what she had just told her about widespread confusion and how she thought a Division meeting to answer questions was appropriate.

36.      On July 29, 2020, Bawol sent a negative critique about Moore by email to Galloway and Moreno, as instructed by Moreno earlier that day, regarding concerns raised by Moore and other employees about confusing processes. Ex. Y; Ex. E at 65:5-23.

> **RESPONSE:** This fact is disputed. Although Defendants do not dispute that Bawol sent an email to Galloway and Moreno on July 29, 2020, Bawol did not send this email because she was "instructed by Moreno." *See* Response to Additional Fact No. 35. Moreover, Bawol's email explicitly says: "Sharing not to call Nicole [Moore] out, but because I am worried about that narrative spiraling from a few folks who were confused or maybe less familiar with some of the brand terms we used and so we can clarify what people are confused about." (Farkas Decl., Ex. Y.) In other words, Bawol was not attempting to get Moore into any sort of trouble, but rather to address confusion by organizing a Division-wide meeting that Moore herself raised about certain terminology.

37.      Bawol testified that she could not recall Moreno ever requesting she document concerns for any Planned Parenthood employees, except for Moore. Ex. E at 66:10-17.

> **RESPONSE:** This fact is disputed. At her deposition, Bawol was asked: "Were there other occurrences where she asked you to document your concerns related to Nicole Moore?" Bawol responded: "I don't recall. If I had concerns, [Moreno] often would have me -- about anyone, she would have me send her an email often." She was then asked whether she could "recall any other person who Ms. Moreno encouraged [her] to document concerns about?" Bawol responded: "No . . . I don't recall, but I would presume there would be many." (Bawol: 66:4–14.) Additional Fact No. 37 therefore misstates Bawol's testimony. In fact, Moreno frequently would ask Bawol to summarize concerns in emails, including about Moore. Bawol simply did not recall names of specific other individuals at that moment.

38.      In the summer through fall of 2020, numerous investigations revealed dozens of complaints of racism by employees of Defendants and its affiliates of a racist working environment. Ex. 6; Ex. 1 at ¶¶ 42, 46-48.

> **RESPONSE:** This fact is disputed. Additional Fact No. 38 refers to *BuzzFeed News* blog posts that are predicated on allegations primarily related to entities entirely unrelated to Planned Parenthood and Planned Parenthood *affiliates*, which are separate entities from the Defendants named in this litigation. (Newman: 26:6–11 (" . . . the affiliates of Planned Parenthood, which are all independent 501(c)(3) organizations").) Affiliates have different staff, different boards, and different leadership. Moreover, many of the quotations in these stories are predicated on anonymous sources, meaning that they are inadmissible hearsay under FRE 401 and 402. There is no admissible evidence cited that would allow any characterization that Defendants had a generally "racist working environment."

39.     In the summer through fall of 2020, internal and external complaints of racism by current and former employees of Defendants led to facilitated conversations regarding Defendants' poor working conditions for staff of color. Ex. 7; Ex. 1 at ¶¶ 42, 46-48.

> **RESPONSE:** This fact is disputed. In the months following the death of George Floyd in May 2020, many businesses and organizations held meetings and facilitated conversations regarding national conditions and issues around race. PPFA was no different. Newman coordinated "CNC Black Staff" meetings, which were optional opportunities for Black employees in the Division to meet. (Newman: 198:5–12.) Contrary to the framing in Additional Fact No. 39, these meetings were not "facilitated conversations regarding Defendants poor working conditions for staff of color." No evidence in the record, beyond Moore's own Declaration, supports that characterization, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

40.     In September 2020, Defendants circulated their "B+C Tracking Doc," which outlined ownership responsibilities for upcoming projects. Ex. F at 121:21-122:8.

> **RESPONSE:** This fact is disputed. The testimony referenced here from Newman's deposition described the "B+C Tracking Doc" as "a brand and culture tracking document that Rachel [Moreno] used to track all of the projects that the brand team was working on across the team, and it was used to inform a weekly email to me about their work." (Newman: 121:21–122:8.)

41.     Moore noticed a lack of Black representation as leaders on the projects listed in Defendants' "B+C Tracking Doc." Ex. 1 at ¶ 43.

> **RESPONSE:** This fact is disputed. Moore alleges a lack of Black representation as leaders on the projects listed in Defendants' "B+C Tracking Doc." However, numerous witnesses testified that she fundamentally misunderstood the information in the B+C Tracking Doc. (Newman: 125:15–126:19; Galloway: 52:6–16.) Moore cites only to her self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

42.     On September 16, 2020, Moore emailed Moreno and Newman: "I am curious about the lack of Black staff representation as Owners of Big Rocks... I find this a little disconcerting..." (hereinafter "September 2020 Complaint"). Ex. AA.

13

**RESPONSE:** This fact is admitted, insofar as it is an accurate quote from the document labeled Exhibit AA, which speaks for itself.

43.     On September 17, 2020, Moreno called Moore about the September 2020 Complaint and told her that it was "unacceptable" to accuse her of "racism." Ex. D at 138:8-14.

**RESPONSE:** This fact is disputed. Moore cites only to her own self-serving deposition testimony to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

44.     In late September 2020, Newman approached Moore about the September 2020 Complaint and told her not to ask "these types of questions" because they "cause division." Ex. D at 140:5-18.

**RESPONSE:** This fact is disputed. Moore cites only to her own self-serving deposition testimony to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

45.     Newman testified Moore was "accusatory," and her complaints were "offen[sive]." Ex. F at 187:8-12; 190:17-22.

**RESPONSE:** This fact is disputed, in that it mischaracterizes Newman's testimony by implying that it relates to Moore's alleged September 2020 Complaint.

46.     On October 20, 2020, Bawol told Garcimonde-Fisher that she had "been very candid with [Gault] about the way [Moore] weaponizes race" and that Moore was "a toxic mess … AND plays the race card." Garcimonde-Fisher replied "totally." Ex. 8; Ex. E at 81:11-16.

**RESPONSE:** This fact is partially disputed, in that it mischaracterizes Exhibit 8, in which Bawol describes Moore as "a toxic mess **who won't collaborate, brags constantly, acts immature and unprofessional**, AND plays the race card" (emphasis added). Moreover, Bawol and Garcimonde-Fisher's views of Moore do not create a dispute of material fact because there is no record evidence that they were decisionmakers with respect to any of the employment actions PPFA took regarding Moore. (Garcimonde-Fisher: 32:14–16; Perez: 126:3–10; Newman: 77:3–78:13, 178:4–11, 204:18–205:1.) *See Louis v. Brooklyn Botanic Garden*, No. 10-CV-5406, 2011 WL 3857127, at *8 (E.D.N.Y. Sept. 1, 2011), *aff'd sub nom. Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603 (2d Cir. 2012) (holding that

stray remarks from non-decisionmakers did not create a dispute of material fact as to whether discrimination motivated plaintiff's termination).

47.     Moreno relied on input from Senior Director, Brand Content and Editorial Strategy, Ylonda Gault, Garcimonde-Fisher, and Bawol in her decisions to place Moore on a PIP and then again later to extend the PIP. Ex. A at 87:16-23; 89:19-25; 90:1-15; 94:15-25; 95:1-18; 173:2-25, 174:1-9.

> **RESPONSE:** This fact is partially disputed insofar as it implies that Gault, Garcimonde-Fisher, and Bawol were decisionmakers with respect to Moore's PIP or the decision to extend it.  It is admitted that numerous members of the Division complained about Moore's performance, including Gamza and others, and these complaints were a factor in Moreno and Newman's decisions to place Moore on a PIP. (Moreno: 221:11–15; Newman: 78:2–13.) Numerous witnesses testified that Moore's PIP was extended in an effort to help her improve her performance to the required level.

48.     On October 29, 2020, Moreno emailed Moore criticizing Moore for her "accusatory tone" and "assumptions of 'rightness.'" Ex. EE.

> **RESPONSE:** This fact is disputed in that it mischaracterizes Moreno's October 29, 2020 email, which states that its intent was to memorialize "the feedback we discussed last week in an email" because Moreno "want[ed] and need[ed] [Moore] to be successful in this role." (Farkas Decl., Ex. EE.) This fact is also disputed insofar as it implies that Moreno's statements about Moore's "accusatory tone" and "assumptions of 'rightness'" have anything to do with complaints regarding race or any other allegedly protected activity.

49.     On November 11, 2020, Moreno assigned Moore as the "Manager" of the Black History Month brief, a "Big Rock Observance," which typically had a 14-to-16-week timeline for completion. Moore had less than six weeks to complete this work. Ex. 1 at ⁋ 55.

> **RESPONSE:** This fact is disputed. Moore cites only to her own self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

50.     Given that Moreno assigned Moore the Black History Month brief on November 11, 2020, it could not have possibly been completed by October 2020. *Id.*

**RESPONSE:** This fact is disputed. Moore cites only to her own self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

51.     On November 11, 2020, Moreno assigned Moore as the "Owner" of the Sanger Brief, a "Big Rock Observance," which typically had a 14-to-16-week timeline for completion. Moore had less than 6 weeks to complete this work. Ex. 1 at ¶ 55.

**RESPONSE:** This fact is disputed. *First*, the Sanger project was not an observance. (Garcimonde-Fisher: 129:18–23.) *Second*, Moore was not the "owner" of the Sanger project—Newman ultimately had to take over the project because Moore failed to do anything. (Newman: 22:10–19.) *Third*, the idea that the Sanger project had a "typical" timeline for completion is nonsensical—it was a one-time project that PPFA undertook to "reframe [its] relationship with [its] founder." (*Id.*) *Fourth*, the project culminated in an op-ed in the New York Times that ran in April 2021, so the idea that Moore had fewer than six weeks to complete the project is false. (*Id.* at 25:22–27:14.) Moore cites only to her own self-serving Declaration to support her contentions, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

52.     On November 16, 2020, Defendants placed Moore on a PIP. The PIP specifically cited Moore's June and September 2020 complaints as performance defects and stated, "failure to examine [Moore's]… assumptions" led to "interpersonal conflicts and tensions." Ex. KK.

**RESPONSE:** This fact is disputed.  The PIP does not make any reference to Moore's alleged June 2020 complaint in which she alleged that Moreno directed her to cut her budget at the last minute.  Moreover, the PIP's reference to Moore's September 2020 email states only that it reflected a "lack of understanding around the work itself, the scope of the projects and even the purpose of the week ahead document" inappropriate for someone at the Director level. (Farkas Decl., Ex. KK.)

53.     Around this same time, Planned Parenthood removed Gamza as Moore's supervisor and installed Moreno as her new supervisor. Ex. A at 78:2-5.

**RESPONSE:** This fact is admitted.

54.     Defendants terminated Gamza, who later sued PPFA and Moreno for race discrimination and retaliation. Ex. F at 28:9-20; Ex. A at 13:22-14:18; *De Souza v. Planned Parenthood Fed'n of Am.*, 21 Civ. 5553 (LGS) (S.D.N.Y. Mar. 29, 2023).

> **RESPONSE:** This fact is partially disputed. PPFA terminated Gamza (who, like Moore, never worked for PPAF). Gamza later sued PPFA and Moreno alleging that PPFA terminated her because she was Jewish. This fact is immaterial to Moore's claims. *See Joiner v. Am. Red Cross*, No. 02-CV-06520, 2004 WL 1638184, at *11 (W.D.N.Y. July 22, 2004), *aff'd*, 144 F. App'x 896 (2d Cir. 2005) (holding that plaintiff may not use evidence of one type of discrimination to prove discrimination of another type).

55.     From November 2020 through April 2021, Moore led many of the major responsibilities in the "Sanger Reframe Project." Ex. 1 at ▯ 68.

> **RESPONSE:** This fact is disputed. Newman testified: "There were many times when [Moore] claimed she had been deeply involved in processes that I observed her to not be deeply involved in. Or she said she was so busy doing the work on this thing – the Sanger work is an example of this where she actually only scheduled one meeting and didn't lead the meeting that she scheduled." (Newman: 101:8–14.) Moore cites only to her own self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

56.     On December 2, 2020, Gault emailed Galloway upset that Moore and two other Black employees (Associate Director Nicole Long and Director Nia Martin-Robinson) designed their BHM brief to address the ongoing racial issues within the organization. Ex. MM; Ex. C at 113:3-114:10.

> **RESPONSE:** This fact is disputed in that it mischaracterizes Gault's email, which indicates that Gault was only upset because Moore, Long, and Martin-Robinson's mismanagement of the BHM project had caused the brief to be significantly delayed: "My suggestion is that we simply lift up and expand 'Stand With Black Women' as a theme. Nia & Nicole M want to do far more – like, address PP racism, etc. So I recommended that, as the MOCHAR's approver, they check in with you sooner than later for guidance on if/how to frame the PP reckoning message. This brief should've BEEN final." (Farkas Decl., Ex. MM.)

57.    On December 10, 2020, Gault reiterated these frustrations to Galloway, Moreno, Garcimonde-Fisher, and Bawol and speculated Moore would "spin" Defendants' pushback "as an example of whitewashing or leadership sabotaging BHM." Ex. NN.

**RESPONSE:** This fact is disputed in that it mischaracterizes Gault's December 10 email, in which she states that her concerns about the BHM brief were with its expansive scope, and whether it was feasible to use BHM as an opportunity to attempt to "solve every issue in the Black experience." (Farkas Decl., Ex. NN.)

58.    Moore never said Defendants' assistance in BHM would constitute "whitewashing" or "sabotaging," rather, this was Gault's interpretation of the words of a different Black employee, Long. Ex. I at 59:7-60:18; 64:11-21.

**RESPONSE:** This fact is admitted.

59.    Gault called Moore one of "the most aggrieved Black women in the organization" because of her history of race complaints. Ex. NN; 64:22-65:1; 65:4-12.

**RESPONSE:** It is admitted that Gault referred to Moore and Long as "the most aggrieved Black women in the organization," but otherwise disputed. Moreover, Gault's views of Moore do not create a dispute of material fact because there is no record evidence that she was a decisionmaker with respect to any of the employment actions PPFA took regarding Moore. (Gault: 190:24–192:19; Perez: 126:3–10; Newman: 77:3–78:13, 178:5–11, 204:21–205:1.) *See Louis v. Brooklyn Botanic Garden*, No. 10-CV-5406, 2011 WL 3857127, at *8 (E.D.N.Y. Sept. 1, 2011), *aff'd sub nom. Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603 (2d Cir. 2012) (holding that stray remarks from non-decisionmakers did not create a dispute of material fact as to whether discrimination motivated plaintiff's termination).

60.    In December 2020, Bawol refused to let her team produce content for the Black History Month observance Moore managed. Ex. 1 at ⁋ 58.

**RESPONSE:** This fact is disputed. Bawol never "refused" to allow her team to produce content for Black History Month. To the contrary, Bawol's team produced significant amounts of content for Black History Month. (Bawol: 89:25–90:5.) Bawol simply told Moore not to go directly to her direct reports to request content without coordinating with Bawol herself first. (*Id.* at 92:6–15.) "[T]here were an extraordinary number of assets that my team was being asked to create without my knowledge, and I wanted to make sure we were supporting the most strategic ones [that we were] most capable of pulling off well. And so I wanted to be a part of the meeting where creative ideation was having—was

happening as creative director of a team." (*Id.* at 93:10–18.) Moore cites only to her self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

61.    In December 2020, Bawol declined to attend and instructed her team not to attend

creative team meetings for the Black History Month observance Moore managed. Ex. 9, Ex. 10,

Ex. 1 at ⸿ 58; Ex. E at 91:20-23.

> **RESPONSE:** This fact is denied, in that it mischaracterizes Bawol's deposition testimony, which states: "I asked to have [the meeting] scheduled for when we could all be there, if I recall, including myself and my team and Nicole, which was not unusual as lead of a team and a colleague of Nicole's. . . . I believe I wasn't invited [to the meeting], and then when I found out and wanted to join, I couldn't make it." (Bawol: 92:16–23.) Exhibit 9 does not state that Bawol instructed her team not to attend *all* creative team meetings for the Black History Month observance, but rather the single meeting referenced in Bawol's deposition testimony. Exhibit 10 states only that Bawol "ha[d] to miss the BHM meeting today."

62.    On January 19, 2021, regarding BHM, Gault told Galloway she believed Moore

"tries to bully the whites." Ex. UU.

> **RESPONSE:** This fact is admitted to the extent that it is an accurate quote from Exhibit UU. However, Gault's views of Moore do not create a dispute of material fact because there is no record evidence that she was a decisionmaker with respect to any of the employment actions PPFA took regarding Moore. (Gault: 190:24–192:19; Perez: 126:3–10; Newman: 77:3–78:13, 178:5–11, 204:21–205:1.) *See Louis v. Brooklyn Botanic Garden*, No. 10-CV-5406, 2011 WL 3857127, at *8 (E.D.N.Y. Sept. 1, 2011), *aff'd sub nom. Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603 (2d Cir. 2012) (holding that stray remarks from non-decisionmakers did not create a dispute of material fact as to whether discrimination motivated plaintiff's termination).

63.    Gault testified that she did not observe Moore treat white coworkers differently, but

she feared the way Moore carried herself and her race complaints made "white liberals" employed

by Defendants "nervous." Ex. I at 79:10-80:11.

> **RESPONSE:** This fact is admitted to the extent that it is an accurate quote from Gault's deposition testimony. However, Gault's views of Moore do not create a dispute of material fact because there is no record evidence that she was a decisionmaker with respect to any of the employment actions PPFA took regarding Moore. (Gault: 190:24–192:19; Perez: 126:3–10; Newman: 77:3–78:13, 178:5–11, 204:21–205:1.) *See Louis v. Brooklyn Botanic Garden*, No. 10-CV-5406, 2011 WL 3857127, at *8 (E.D.N.Y. Sept. 1, 2011), *aff'd sub*

*nom. Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603 (2d Cir. 2012) (holding that stray remarks from non-decisionmakers did not create a dispute of material fact as to whether discrimination motivated plaintiff's termination). Furthermore, Gault testified that she did not know whether Moore's conduct made others uncomfortable, but she believed Moore "intended to make [others] uncomfortable." (Gault: 80:5–11.)

64.     On January 25, 2021, Gault and Garcimonde-Fisher jointly submitted a written performance critique regarding Moore to Moreno and Galloway, which criticized Moore for "[m]ak[ing] big statements" regarding race and noted Moore's June 2020 Complaint and subsequent concern regarding tokenization in staffing. Ex. WW; Ex. I at 95:18-96:25; 97:1-3; 104:13-105:20; 107:23-109:6; Ex. G at 52:1-24; 97:2-13;100:24-25-102:6; 104:21-105:2.

> **RESPONSE:** It is admitted that Gault and Garcimonde-Fisher identified a wide range of performance deficiencies in their January 25, 2021 email, which speaks for itself. (Farkas Decl., Ex. WW.) However, Garcimonde-Fisher and Gault's views of Moore do not create a dispute of material fact because there is no record evidence that they were a decisionmaker with respect to any of the employment actions PPFA took regarding Moore. (Garcimonde-Fisher: 32:14–16; Gault: 190:24–192:19; Perez: 126:3–10; Newman: 77:3–78:13, 178:5–11, 204:21–205:1.) *See Louis v. Brooklyn Botanic Garden*, No. 10-CV-5406, 2011 WL 3857127, at *8 (E.D.N.Y. Sept. 1, 2011), *aff'd sub nom. Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603 (2d Cir. 2012) (holding that stray remarks from non-decisionmakers did not create a dispute of material fact as to whether discrimination motivated plaintiff's termination).

65.     The email accused Moore of using her race to "avoid[] accountability," and "paint[] herself as a victim." Ex. WW; Ex. I at 110:4-12; Ex. G at 110:12–22.

> **RESPONSE:** This fact is disputed. Although Gault and Garcimonde-Fisher's January 25, 2021 email states that Moore "avoids accountability" and "paints herself as a victim," it does not state that Moore does so "using her race." Furthermore, Garcimonde-Fisher and Gault's views of Moore do not create a dispute of material fact because there is no record evidence that they were a decisionmaker with respect to any of the employment actions PPFA took regarding Moore. (Garcimonde-Fisher: 32:14–16; Gault: 190:24–192:19; Perez: 126:3–10; Newman: 77:3–78:13, 178:5–11, 204:21–205:1.) *See Louis v. Brooklyn Botanic Garden*, No. 10-CV-5406, 2011 WL 3857127, at *8 (E.D.N.Y. Sept. 1, 2011), *aff'd sub nom. Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603 (2d Cir. 2012) (holding that stray remarks from non-decisionmakers did not create a dispute of material fact as to whether discrimination motivated plaintiff's termination).

66.     Upon receiving this email, Vice President of Leadership and Culture Danette Hill instructed Senior Director of Human Resources, Charise Beckett, to reach out to outside counsel regarding Moore's "allegation" regarding race. Ex. J at 82:12-83:14.

**RESPONSE:** This fact is disputed. The cited testimony from Hill's deposition does not support the contention that she instructed Beckett to reach out to outside counsel "regarding Moore's 'allegation' regarding race."

67.     Hill had no relationship with Moore, did not have personal knowledge or involvement in her complaints, and only learned of her complaints secondhand. Ex. J at 90:11-19; 101:24-25.

**RESPONSE:** This fact is not disputed to the extent that Hill did not supervise Moore. Rather, she served as the Chief Human Resources Officer of PPFA. She therefore did not have "personal knowledge" of Moore's performance deficiencies in the sense that she would not have personally observed those deficiencies; that was not her role.

68.     In January 2021, Defendants extended Moore's PIP. Ex. ZZ.

**RESPONSE:** This fact is admitted.

69.     In January 2021, Moore complained to Beckett that her PIP was "unfair" and "inaccurate." Ex. 11; Ex. 12; Ex. 1 at ¶ 59.

**RESPONSE:** This fact is disputed.  Neither Exhibit 11 nor Exhibit 12 indicate that Moore complained to Beckett that her PIP was "unfair" and "inaccurate." Instead, Moore relies solely on her own self-serving Declaration for this contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

70.     In January 2021, Beckett did not investigate or meaningfully respond to Moore's complaint regarding her PIP. *Id*.

**RESPONSE:** This fact is disputed. Moore relies solely on her own self-serving Declaration to support her claim that she made any sort of complaint, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

21

71.     Following the PIP extension, Moore recognized Defendants viewed her history of

race complaints as a basis for termination and, therefore, ceased making race complaints. Ex. 1 at

⁋ 63.

> **RESPONSE:** This fact is disputed. *First*, Defendants deny that Moore ever made "race
> complaints." Regardless, this statement is a legal conclusion that is inappropriate for Rule
> 56.1 Statements. *Second*, PPFA did not terminate Moore because of purported "race
> complaints." Rather, the undisputed evidence shows that Moore was terminated because of
> her lengthy history of poor performance that was well-documented by her supervisors and
> colleagues for over a year. (*See* Farkas Decl., Exs. V, W, X, Y, BB, CC, DD, EE, FF, GG,
> HH, II, JJ, KK, MM, NN, OO, PP, QQ, RR, TT, VV, WW, XX, YY, ZZ, AAA, BBB, CCC,
> DDD, EEE, FFF, GGG, HHH, III, LLL, MMM, PPP, QQQ, TTT, VVV, WWW, YYY, ZZZ,
> AAAA, BBBB, CCCC, DDDD, EEEE, HHHH, IIII, JJJJ, KKKK, LLLL, MMM, NNNN,
> PPPP, and CCCCC.) *Third*, Moore relies solely on her own self-serving Declaration for
> this contention, which cannot create a triable issue of fact where it is entirely unsupported
> by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13
> (S.D.N.Y. Sept. 3, 2021).

72.     On March 22, 2021, Defendants removed Moore from the PIP. Ex. LLL.

> **RESPONSE:** This fact is admitted.

73.     The reasons for removing Moore from the PIP included: (1) Moore stopped raising

complaints of racism and (2) so that she could be an "employee in good standing" and obtain a

discretionary salary increase. Ex. 1 at ⁋ 63. Ex. KKK; Ex. C at 173:12-15; 174:10-17. Ex. F at

79:3-15. Ex. J at 59:20-25; 60:2-9.

> **RESPONSE:** This fact is partially disputed. It is true that part of the motivation for
> removing Moore from the PIP in March 2021 was to allow her to obtain a standard annual
> salary adjustment that would not have been available to her had she remained on a PIP.
> (Newman: 79:3–10; 81:1–9.) Additionally, PPFA wanted to give Moore a "clean slate as a
> refresh" to succeed under Perez, who had just been hired and would serve as Moore's new
> manager. (Moreno: 198:2–7; Hill: 60:6–9, 61:13–23.) The assertion that PPFA removed
> Moore from the PIP because she "stopped raising complaints of racism" is false and has
> no factual support other than Moore's self-serving Declaration, which cannot create a
> triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am.
> Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

74.     In or around March 2021, Moore complained at a CNC Black Staff meeting regarding Defendants' failure to promote Black employees during its annual promotion period. Ex. 1 at ¶¶ 65-66.

> **RESPONSE:** This fact is disputed. Moore cites only to her own self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

75.     On March 29, 2021, Senior Director Sandra Perez was hired and assigned as Moore's supervisor. Ex. 1 at ¶ 64.

> **RESPONSE:** This fact is admitted.

76.     On May 18, 2021, Perez resisted Moreno's efforts to place Moore on another PIP, stating Moore would "know where it's headed." Perez stated she preferred a "hybrid' approach," i.e., terminating Moore on the combined purported bases of performance and a restructuring and asked Moreno to follow up with Gallway about the "hybrid approach." Ex. OOO.

> **RESPONSE:** This fact is disputed in that it implies that terminating Moore on the basis of performance and a restructuring is contrived. Moore had a lengthy history of poor performance that was well-documented by her supervisors and colleagues for over a year. (*See* Farkas Decl., Exs. V, W, X, Y, BB, CC, DD, EE, FF, GG, HH, II, JJ, KK, MM, NN, OO, PP, QQ, RR, TT, VV, WW, XX, YY, ZZ, AAA, BBB, CCC, DDD, EEE, FFF, GGG, HHH, III, LLL, MMM, PPP, QQQ, TTT, VVV, WWW, YYY, ZZZ, AAAA, BBBB, CCCC, DDDD, EEEE, HHHH, IIII, JJJJ, KKKK, LLLL, MMM, NNNN, PPPP, and CCCCC.) And, Perez testified that she had discussions with Moore about "[t]he restructuring of [Moore's] position . . . so it would better align with the work of the team," which resulted in multiple changes to Moore's job description. (Perez: 46:1–14.) Moore admits that her job description was changed multiple times during her tenure with PPFA. (Moore: 100:11–13.)

77.     On May 18, 2021, per Perez's request, Moreno contacted Galloway regarding the "hybrid approach," i.e., terminating Moore on the combined purported bases of performance and a restructuring. Ex. OOO; Ex. 13.

> **RESPONSE:** This fact is admitted insofar as Exhibit 13 reflects a conversation between Moreno and Galloway regarding performance-based and restructuring-related reasons for

Moore's termination.  Galloway states: "Great I think with [Moore] **it's a bit of both in all truthfulness**." (Ex. 13.) *See also* Response to Additional Fact No. 76.

78.    On May 18, 2021, Moreno sent Galloway a list of "options" regarding Moore, including various methods of eliminating Moore's position through a contrived restructuring. Ex. 13, Ex. 14.

> **RESPONSE:** This fact is disputed. *See* Response to Additional Fact Nos. 76 & 77. Additionally, PPFA made the ultimate decision to proceed with "Option 4" reflected in Exhibit 14, which was to keep Moore in her Director role, but adapt the job duties of that role to the changing needs of the Division and "monitor her ability to handle the rescoped role." (Ex. 14.)

79.    From May through September 2021, Defendants did not counsel Moore on any purported performance deficiencies and even complimented her work on the Juneteenth observance. Ex. 1 at ⁋ 69.

> **RESPONSE:** This fact is disputed. Moore cites only to her self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

80.    In July 2021, Defendants assigned Moore to complete the Stand with Black Women Awards alone, despite this project previously having a team of seven, which added to Moore's disproportionately large workload when compared to her white peers. Ex. 1 at ⁋ 70.

> **RESPONSE:** This fact is disputed. Moore cites only to her own self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021). Numerous witnesses testified that Moore had a disproportionately *light* workload when compared to her peers of all races. (Farkas Decl. Exs. WW, TTT, and UUU; *see also* Newman: 188:4–17.)

81.    In or about late July or early August 2020, Moore created and spearheaded Defendants' "Dear Sonia Sotomayor" project, which Perez praised. Ex. H at 131:3-14. Ex. 1 at 79.

> **RESPONSE:** It is admitted that Moore created and spearheaded Defendants' "Dear Sonia Sotomayor" project, the idea of which Perez praised. However, it is admitted that Moore's management of the Dear Sonia Sotomayor project was catastrophic, leading two of the four

artists she engaged to threaten dropping out. (Perez: 131:5–14; *see also* Farkas Decl., Exs. OOOO & NNNN; Supp. Farkas Decl., Exs. EEEEE, FFFFF, GGGGG.)

82.     Moore was responsible for securing and engaging social media poet influencers to write a poem that Defendants would feature on its social media channels each week of the month. *Id*.

> **RESPONSE:** This fact is admitted.

83.     In or around August 2021, Planned Parenthood terminated Moreno, in part, because of the growing number of HR complaints against her, including complaints of discrimination, harassment, and retaliation. Ex. F at 28:16–20; 29:18–30:3. Ex. B at: 27:18–28:17; 29:2–14. Ex. 22. Ex. 23.

> **RESPONSE:** This fact is disputed. Although Moreno's employment was terminated, the cited testimony and documents do not support the contention that Moreno was terminated because of complaints against her alleging discrimination, harassment, and retaliation. To the contrary, Newman testified that Moreno was terminated for "performance issues," which included complaints PPFA received that Moreno was unable "to collaborate with her peers and [engaged in] general abrasive behavior with people in other departments," and also "that she was controlling as it related to work product; that she was territorial; that she could be rude." (Newman: 28:16–20, 55:2–20, 57:4–17.) Newman did not recall receiving any complaints of discrimination about Moreno. (*Id.* at 61:9–15.) Similarly, Beckett testified that Moreno left PPFA because of complaints that "she was demanding and had really high expectations, and she was intense." (Beckett: 28:8–22.) Those concerns were echoed in Exhibits 22 and 23, neither of which allege that Moreno discriminated against the complainants.

84.     There were at least four internal complaints against Moreno which Defendants considered in her termination: Defendants' former employee Johanny Adames, a Black-Latina; Defendants' former employee Bonyen Lee-Gilmore, an Asian woman; and two anonymous complainants. Ex. F at 54:22-55:1-4; 56:5-14.

> **RESPONSE:** This fact is disputed. *See* Response to Additional Fact No. 83.

85.     Adames informed Moore that she submitted a race discrimination complaint against Moreno. Ex. D at 55:15-20.

**RESPONSE:** This fact is disputed. Moore cites only to her own self-serving deposition testimony to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

86.     One complaint stated: "Rachel Moreno abuses her power and authority…to belittle and cause fear…She has no boundaries. She is a bully. I am too scared of retaliation [if I] go to HR and there are no other avenues to report her behavior. I am even terrified to send this anonymously for fear that it will be shown to her and get back to me. But I would shrink every time I was around her in the office and now I flinch every time she sends an email that I am on. If that's not the sign of an abuser I don't know what is." Ex. 22.

**RESPONSE:** This fact is admitted in that it contains an accurate quote from Exhibit 22, which speaks for itself. *See also* Response to Additional Fact 83.

87.     Another complaint stated: "When staff of color from lower ranking positions speak up about DEI concerns, it is seen as an attack against staff of color in higher ranking positions. This is a big problem and can be illustrated by the number of POCs in the CNC division who have resigned in the past year … folks who have left before me who were too scared to be honest in their exit interviews out of fear of future retaliation. This is disturbing to me given our commitments as an organization and as a department to bettering our workplace. We've been told repeatedly that bettering this environment is "on all of us" yet, when we speak up … we are publicly rebuked by leadership and discouraged from ever doing so again … This is layered into race equity challenges I experienced -- positions added on top of me and filled by white women -- and not once was I offered the opportunity to move into those positions. This is ultimately why I made the decision to leave … I leave disheartened and disturbed by the racial hierarchies mentioned above and culture of fear that exists around speaking up when we see workplace injustices. I often wonder whether PPFA is truly committed to improving our own internal racism

and structural problems given the culture around fear we as staff experience. I hope we can adopt real tools for accountability and that leadership can be more self reflective about the toxic work environment that continues to permeate throughout this organization … Rachel Moreno is a huge problem … in terms of toxic work environments, … I'd like to explicitly name that she is a bully and is consistently unaccountable to her actions. I've been told repeatedly that she is valued because 'she produces'. To me, that means we prioritize production over people. She should be replaced." Ex. 23.

> **RESPONSE:** This fact is disputed, in that it takes the language in Exhibit 23 out of context. Exhibit 23 is an exit interview submitted by former PPFA employee Bonyen Lee-Gilmore. Lee-Gilmore did not report to Moreno—she was not even in the same department as Moreno. (Newman: 56:17–22.) As such, there is no basis to believe that the language cited above that proceeds Moreno's name refers to her at all.

88.     Defendants failed to preserve Adames' complaint and the second anonymous discrimination complaint against Moreno. Ex. F at 54:22-55:1-4; 56:5-14.

> **RESPONSE:** This fact is disputed. There is no evidence that these alleged complaints ever existed at all.

89.     Because of Defendants' destruction of these discrimination complaints, Moore is unable to provide this additional documentary evidence demonstrating Moreno's treatment towards nonwhite employees, and Defendants' knowledge of Moreno's discriminatory behaviors during the time of Moore's employment.

> **RESPONSE:** This fact is disputed. *See* Response to Additional Fact No. 88.

90.     As part of Moreno's transition out of the organization, Defendants empowered Senior Directors Garcimonde-Fisher, Gault, and Perez to co-lead B&C until a new Vice President was selected. Ex. G at 34:1-17; Ex. I at 149:16-21;149:22-150:3, Ex. H at 97:18-98:3.

> **RESPONSE:** This fact is disputed, insofar as Garcimonde-Fisher, Gault, and Perez were simply tasked informally with ensuring the Division continued to function in the absence of a Vice President: "No, there was no formal, okay, in the absence of a VP, it's you, you

and you. We just had to fend for ourselves and do the best we could to keep everything running. We had no official, you know, titles or new responsibilities, just to keep everything – the trains on the track." (Gault: 148:21–149:2.)

91.      In August 2021, Defendants circulated their 2022 Fiscal Year Observances Calendar, which distributed the workload for the upcoming observances, and assigned Moore as Owner of 11 observances including all Black observances. Ex. UUU.

**RESPONSE:** This fact is disputed. The only evidence in the record to support this contention is Moore's own self-serving statement. (Farkas Decl., Ex. UUU.)

92.      A Black observance was a calendar demarcation celebrating Black cultural moment, cultural reflection in history, and raising cultural awareness. Ex. F at 67:11-20.

**RESPONSE:** This fact is admitted.

93.      Directors at PPFA are usually assigned one or two observances per year. Ex. D at 181:4-10; 185:4-21.

**RESPONSE:** This fact is disputed. Moore cites only to her own self-serving deposition testimony to support her contention, which cannot create a triable issue of fact where it is entirely unsupported by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

94.      Director of Brand Marketing Gabrielle Stopper, a white woman, was not assigned any work related to observances. Ex. D at 185:22-186:9; Ex. 1 ¶¶ 71-72.

**RESPONSE:** This fact is disputed. Gabrielle Stopper's title was Director of Research. (Perez: 92:4–93:2.) Given that she was not in any type of project management role, "[Stopper] would never have done any observances. She had never done any before." (*Id.* at 92:18–93:2.)

95.      Director of Brand Strategy and Projects Perry Meyers, a white woman, was assigned as Owner to one observance, STI Testing Month, which is not a Black observance. Ex. D at 181:4-10; Ex. 1 ¶¶ 71, 73.

**RESPONSE:** This fact is disputed. In 2021, Garcimonde-Fisher's Brand Strategy and Projects team was assigned the "big rock" observances—those that required the most work

and the creation of numerous assets and collateral. (Garcimonde-Fisher: 129:7–17; *see also* Newman: 173:5–15, Galloway: 50:19–51:10.) Perez's Brand Marketing team was assigned the "small rock" and "medium rock" observances. (Garcimonde-Fisher: 129:7–17.) Perry Meyers was on Garcimonde-Fisher's team, and thus was assigned the "big rock" observances, "observances that were priority observances, that were month-long observances. There was only a handful of those." (Perez: 92:4–11.) The only Director other than Moore on Perez's team was Stopper, who did not handle observances. *See* Response to Additional Fact 94.

96.     Stopper, Meyers, and Moore all had similar responsibilities, were generally assigned similar work, were held to the same expectations by Defendants, and reported to the same supervisors. Ex. 1 ¶ 9.

**RESPONSE:** This fact is disputed. Moore cites only to her own self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

97.     The amount of observance work Defendants assigned Moore was an inordinate and onerous amount of work. Ex. D at 185:22-186:9; 237:19-22.

**RESPONSE:** This fact is disputed. Moore cites only to her own self-serving deposition testimony to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021). To the contrary, Moreno testified that "observances were a small sliver of the initiatives that we were working on. So observances were not a big part of the strategy." (Moreno: 125:15–20.)

98.     Defendants considered its employees' races when assigning work. For example, Defendants assigned Black employees work tailored to Black audiences. Ex. C at 139:1-140:4; Ex. A at 133:25–134:13; Ex. J at 76:13-20; Ex. 1 at ¶¶ 71-75; Ex. 3 at ¶ 5.

**RESPONSE:** This fact is disputed. None of the testimony cited supports this alleged fact. Galloway, when asked whether PPFA "consider[ed] race in staffing," responded: "That's not what I said here nor what I was thinking." (Galloway: 140:6–11.) Moreno, when asked whether "race [was] ever a consideration in determining which employees would be working on which observances," said: "No." (Moreno: 133:20–23.) Hill testified that PPFA's ERGs—entirely voluntary associations—often were asked to lead activities relating to the focus of that ERG. (Hill: 76:6–79:25.) Nicole Long, whose Declaration is cited here as Exhibit 3, was not a member of management, and thus has no personal knowledge regarding how work was assigned at PPFA. Her assertion to the contrary in her

declaration is not a "fact" but rather Long's subjective assessment of how she believed work was assigned. Moore's Declaration, cited here as Exhibit 1, is self-serving, and thus cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021).

99.     On August 20, 2021, Moore emailed Perez: "I'm not sure how this observance work was divided up in the first place and would like clarity about that. I don't think that just because I'm Black I would be responsible for owning all of the Black observances. That is tokenizing… clearly this work does not necessitate same race, same gender, same sexuality in ownership roles in order to roll out successfully." Ex. TTT (hereinafter, the "August 2021 Complaint").

**RESPONSE:** This fact is admitted insofar as it is an accurate quote from Moore's August 20, 2021 email, which speaks for itself.

100.     On August 20, 2021, Perez forwards Moore August 2021 Complaint to Galloway, who replied: "[w]hat is wrong with her!" Galloway subsequently forwarded the complaint to Beckett. Ex. TTT; Ex. UUU.

**RESPONSE:** This fact is admitted insofar as it is an accurate quote from Galloway's August 20, 2021 email, which speaks for itself.

101.     On August 24, 2021, Perez forwarded August 2021 Complaint to Garcimonde-Fisher and added, "I can't" (translated from Spanish). Ex. VVV; Ex. H at 74:1-8.

**RESPONSE:** This fact is admitted insofar as it is an accurate quote from Perez's August 20, 2021 email, which speaks for itself.

102.     Perez informed Gault about the August 2021 Complaint. Ex. H at 77:15-78:7.

**RESPONSE:** This fact is disputed. The cited testimony states that Perez informed Gault of a conversation between Moore and Melissa Lopez, a Manager on Perez's Brand Marketing team. (Perez: 77:9–78:21.)

103.     On August 27, 2021, Gault emailed Perez and Garcimonde-Fisher a draft memorandum to be sent collectively from the three to Galloway and Newman encouraging Moore's termination. Ex. WWW; Ex. I at 129:4-11; 159:7-23.

**RESPONSE:** This fact is admitted. It is denied that this email was ever actually sent to Galloway and Newman.

104.    The August 27, 2021 memorandum stated: "Nicole Moore – who shirks responsibility; makes baseless claims; and spews negativity – is making an already challenging situation untenable. The amount of energy it takes to manage insubordination, coupled with lies and disinformation is emotionally and physically draining… The latest grievance – over owning part of what she calls 'a tokenizing' and 'grinding' observance workstream – is a bridge too far. She has to go." *Id*.

**RESPONSE:** This fact is admitted insofar as it contains an accurate quote from Gault's ultimately unsent draft email, which speaks for itself.

105.    Defendants never investigated Moore's complaints of being tokenized on the basis of race. Ex. B at 78:4–17; 100:9–24; 124:16–125:12.

**RESPONSE:** This fact is admitted, insofar as there was no reason to conduct an investigation because the informal leaders of the Brand + Culture team were already aware of how observances were assigned and knew that it was not because of Moore's race. *See* Response to Additional Fact 95.

106.    Meanwhile, on August 31, 2021, Moore received "the rock," a job performance award, from her coworker. Ex. 1 at ¶ 81.

**RESPONSE:** This fact is disputed. "The rock" is not a "job performance award." There is no selection process, and it is not given formally by PPFA or the Division. Rather it is an informal peer-to-peer recognition. Moore was given the recognition by her friend, Tasha Chambers. Leaders of the Division were shocked by the decision to recognize Moore, given that she was a very low-performing employee. (Garcimonde-Fisher: 132:4–17; 133:19–22; 149:4-12; Galloway: 183:16–19.)

107.    On September 2, 2021, Gault forwarded Garcimonde-Fisher and Perez an email under the subject line "a plan," to discuss their ongoing effort to have Moore fired. Ex. YYY; Ex. I at 160:21-161:14.

**RESPONSE:** This fact is admitted insofar as the cited document makes clear that Gault, Garcimonde-Fisher, and Perez all had significant concerns about Moore's performance that

they believed merited termination. However, Newman was the sole decisionmaker regarding Moore's termination. (Newman: 204:21–205:1.)

108.   Gault and Garcimonde-Fisher stated Perez should "push back" on the idea of another PIP, and attached a document which included a final draft of the memorandum supporting Moore's termination, as well as "talking points" for Perez to use while advancing this effort. Id; see also Ex. ZZZ.

**RESPONSE:** *See* Response to Additional Fact No. 107.

109.   The final draft of the memorandum stated Moore "waged protests over her calendar observance assignment and made baseless claims that she is being tokenized." Ex. ZZZ.

**RESPONSE:** *See* Response to Additional Fact No. 107.

110.   The talking points discouraged a PIP, acknowledged these efforts could be viewed as "unjust/racist," and speculated Moore would perpetuate a narrative that "white-presenting" Latinos were "plotted against her." *Id*; *see also* Ex. H at 111:9-113:10.

> **RESPONSE:** This fact is admitted insofar as it contains an accurate quote from the cited document, which speaks for itself. Regardless, Newman was the sole decisionmaker regarding Moore's termination. (Newman: 204:21–205:1.) *See Louis v. Brooklyn Botanic Garden*, No. 10-CV-5406, 2011 WL 3857127, at *8 (E.D.N.Y. Sept. 1, 2011), *aff'd sub nom. Louis v. Brooklyn Botanic Gardens*, 487 F. App'x 603 (2d Cir. 2012) (holding that stray remarks from non-decisionmakers did not create a dispute of material fact as to whether discrimination motivated plaintiff's termination).

111.   In or about early September 2021, Garcimonde-Fisher, Gault, and Garcimone-Fisher sent Newman and Galloway a memorandum encouraging Moore's termination. Ex. GGGG; Ex. I at 160:2-20.

> **RESPONSE:** This fact is disputed. There is no evidence in the record that the document cited as Exhibit GGGG was ever sent to Newman or Galloway.

112.    On September 10, 2021, Perez sent Gault and Garcimonde-Fisher a draft email addressed to Newman and Galloway, which argued "Nicole Moore…is further poisoning the well with talk of 'white supremacy' and 'tokenism.'" Ex. CCCC.

> **RESPONSE:** This fact is disputed, in that it mischaracterizes Perez's statement and takes it out of context. Perez's frustration with Moore's refusal to do the observance work she was assigned was that Moore claimed she was "swamped while there's little evidence of work product." (Farkas Decl., Ex. CCCC.)

113.    On September 10, 2021, Perez sent Newman and Galloway an email which argued "Nicole Moore…is further poisoning the well with talk of 'white supremacy' and 'tokenism.'" Ex. KKKK; Ex. DDDD.

> **RESPONSE:** This fact is disputed, in that it mischaracterizes Perez's statement and takes it out of context. Perez's email makes clear that her frustration was Moore's refusal to do her assigned work at a time when the Division was critically short-staffed: "My worst fears are being realized about how [Moore] is continuing to go about not doing her work but instead spending her time trying to recruit folks to agree with her narrative/strategy – to push back against our leadership, the work we need to be doing and the team work that should be part of our culture, especially at a time where we don't have a department head, are short staffed, and abortion is under threat like never before." (Farkas Decl., Ex. KKKK.) Furthermore, Exhibit DDDD does not support this alleged fact.

114.    On September 10, 2021, Newman responded to Perez's email which argued "Nicole Moore… is further poisoning the well with talk of 'white supremacy' and 'tokenism'" by setting up a meeting later that day to discuss Moore's complaint and potential discipline. Ex. IIII.

> **RESPONSE:** This fact is admitted insofar as Newman responded to Perez's email by requesting to set up a meeting.

115.    On September 10, 2021, Gault messaged Newman about the August 2021 Complaint, referring to it as a "continuation of the same gripes and then some." She stated "I *think* I have an idea," which the two women discussed in a subsequent call. Ex. FFFF.

> **RESPONSE:** This fact is admitted insofar as it contains an accurate quote from the cited document, which speaks for itself.  Newman responded by pointing out that Moore's job description makes it squarely her responsibility to "[m]anage calendar small/medium rock observances and process." (Farkas Decl., Ex. FFFF.)

116.     On September 10, 2021, following a call with Newman, Gault reported back to Garcimonde-Fisher and Perez that "[Newman]… seem[ed] committed to getting rid of Nicole [Moore]. When [Gault] mentioned structural change [Newman] said 'I'm light years ahead of you.' Said [Galloway] discussed eliminating [multicultural] roles altogether." Newman stated, "over and over, she had 'zero fucks' for this b.s." and that "the only question is timeline." Ex. GGGG; Ex. I 178:8-22; 181:9-23; 183:5-13; 184:6-21.

> **RESPONSE:** This fact is disputed, as it is based on inadmissible hearsay within hearsay, as it pertains to Gault's statements regarding her and Newman's alleged prior statements during their September 10, 2021 call. *See* FRE 801, 803.

117.     On September 10, 2021, Perez forwarded the August 2021 Complaint to Newman, and added: "[n]ot sure if [Galloway] shared this with you but, FWIW, I wanted you to have background from the latest struggle with Nicole. I'll have the final warning to [Galloway] by Monday – I'd like to move on ASAP so we can get the clock ticking." Ex. JJJJ.

> **RESPONSE:** This fact is admitted insofar as it contains an accurate quote from the cited document, which speaks for itself.

118.     Garcimonde-Fisher, Gault, and Perez drafted the Final Written Warning. Ex. 15; Ex. 16.

> **RESPONSE:** This fact is disputed. Perez drafted the Final Written Warning, and Garcimonde-Fisher and Gault reviewed that draft and provided comments. (Garcimonde-Fisher: 175:10–20.)

119.     On September 16, 2021, Defendants placed Moore on the Final Written Warning, which specifically cited the August 2021 Complaint as the basis for discipline: "you continue to engage in behavior that is not consistent with PPFA's values, but instead, is what we as leaders have found to be toxic…. [a]ccusing leadership of assigning all the observances to women of

color…you named colleagues, Gabrielle and Perry, as 'white women' who aren't doing the 'grinding work" of observances, which is inappropriate." Ex. LLLL.

> **RESPONSE:** This fact is disputed, in that it takes this language out of context. The Final Written Warning states: "Accusing leadership of assigning all the observances to women of color – while as a leader, unconcerned for helping to manage the work when we are short staffed or acknowledging how diverse the team is which impacts assignments. Instead, you named colleagues, Gabrielle and Perry, as 'white women' who aren't doing the 'grinding work' of observances, which is inappropriate and also demonstrates lack of understanding for their areas of expertise or workloads. Also, Perry is the 'O' on STI awareness which is 1 of only 2 heavy lifts this year so your assessment is also inaccurate." (Farkas Decl., Ex. LLLL.)

120.    Perez was generally aloof and unsupportive to Moore during the Final Written Warning period. Ex. D at 25:5-11.

> **RESPONSE:** This fact is disputed. *First*, this assertion is not a "fact" but rather a statement of Moore's personal opinion about Perez's demeanor. *Second*, Perez testified that when she started in her role in March 2021, she expressed every intention of helping Moore. She "had a good track record of managing and building teams" during her previous role with a PPFA affiliate in Seattle. "I had worked at a [Planned Parenthood] affiliate for a long time, I wanted to try to help Nicole succeed . . . . I am somebody who is very supportive of my team. And so I embraced the opportunity to help Nicole and to see what I could do to help her succeed." (Perez: 20:4–11.) However, Perez quickly experienced the same problems with Moore's performance that Moreno, Newman, Galloway, Garcimonde-Fisher, Gault and others had all observed. (Farkas Decl., Exs. AAA, PPP, BBBB, CCCC, DDDD, HHHH, IIII & KKKK.)

121.    Moore engaged four social media "influencers" for the "Dear Sonia Sotomayor" project. Ex. 1 at ¶¶ 79-80.

> **RESPONSE:** It is admitted that Moore engaged four social media "influencers" for the "Dear Sonia Sotomayor" project, two of whom threatened to drop out of the project due to her mismanagement. (Supp. Farkas Decl., Exs. EEEEE, FFFFF, GGGGG.)

122.    Defendants' regular practice when engaging with social media influencers on projects is to pay each influencer based on the size of their social media following. *Id.*

> **RESPONSE:** This fact is disputed. Moore cites only to her own self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13

(S.D.N.Y. Sept. 3, 2021). Garcimonde-Fisher stated her belief that PPFA "typically pa[id] equal fees for equal work." (Supp. Farkas Decl., Ex. FFFFF.)

123.    Perez deviated from Defendants' regular practices for the "Dear Sonia Sotomayor" project, by offering to pay all influencers the same, following complaints by one influencer regarding his pay. *Id.*

> **RESPONSE:** This fact is disputed. Moore cites only to her own self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021). Garcimonde-Fisher stated her belief that PPFA "typically pa[id] equal fees for equal work." (Supp. Farkas Decl., Ex. FFFFF.)

124.    Perez's deviation from Defendants' regular practices for the "Dear Sonia Sotomayor" project caused unintended delays with contracting, which in turn, delayed the entire project. *Id.*

> **RESPONSE:** This fact is disputed. Moore cites only to her self-serving Declaration to support her contention, which cannot create a triable issue of fact where it is contradicted by the record. *Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021). Email correspondence makes clear that the "delays with contracting" were attributable to Moore's mismanagement of the contracting process. (Supp. Farkas Decl., Exs. EEEEE, FFFFF, GGGGG.)

125.    On October 15, 2021, Moore emailed Perez a written rebuttal to her Final Written Warning (the "PIP Rebuttal"), which memorialized the pattern of discrimination and retaliation Defendants subjected her to during her employment and disputed the many inaccuracies in warning. Ex. RRRR.

> **RESPONSE:** This fact is admitted to the extent that Moore emailed Perez and Newman with a document entitled "PIP Rebuttal" dated October 15, 2021. However, Defendants deny the substance of this document, including the assertions that it "memorialized" any "pattern" of discrimination and retaliation.

126.    Defendants' contemplated labeling Moore's termination as part of a restructuring so that Defendants could offer Moore severance. Ex. QQQQ; Ex. OOOO; Ex. WWWW; Ex. UUUU.

**RESPONSE:** This is disputed. PPFA had a practice of offering severance for all terminations, regardless of the reason. (Hill: 128:8–19.)

127.   Defendants anticipated Moore would bring a lawsuit against them before they terminated her. Ex. WWWW; Ex. 18.

**RESPONSE:** This fact is admitted.

128.   On October 15, 2021, Perez emailed Beckett and Newman the following in response to Moore's protected complaints in the PIP Rebuttal: "It's clear Nicole suspects we are moving forward with termination tomorrow… [g]iven this situation, I wanted to raise that I've been in conversation with [Galloway] about restructuring the team and provided her with a [job description] for a director of marketing and brand engagement so don't plan to rehire for a multicultural director again -- that said, is there still an option to terminate Nicole but provide a severance as technically we could lay her off (or pay her off so she doesn't pursue a lawsuit)?" Ex. WWWW.

**RESPONSE:** This fact is admitted insofar as it contains an accurate quote from the cited document, which speaks for itself. However, Perez was uninformed regarding PPFA's severance practices, which were to offer severance to every employee terminated, regardless of reason. (Hill: 128:8–19.)

129.   Beckett responded to Perez's October 15, 2021 email that Defendants would offer Moore severance. *Id.*

**RESPONSE:** This fact is admitted. PPFA had a practice of offering severance for all terminations, regardless of the reason. (Hill: 128:8–19.)

130.   Defendants' Severance Plan states, "[s]everance benefits are only payable if an Eligible Employee incurs an Eligible Termination," with an Eligible Termination defined as "termination… by reason of reduction in force, reorganization or elimination of the employee's position." "An Eligible Termination does not encompass… involuntary termination by PPFA for unsatisfactory performance." Ex. O.

**RESPONSE:** This fact is disputed. It provides an incomplete and misleading quotation to describe PPFA's severance policies. PPFA has discretion to provide severance packages to employees even when those employees are terminated for cause. As a matter of practice, PPFA always exercises that discretion. (Manley: 61:1–24; 62:7–25.) As Manley explained, PPFA "is very supportive of colleagues and want[s] to . . . help with any transitions, certainly involuntary transitions [and] . . . . we don't want folks to be stranded for too long without healthcare." (*Id.*)

131.    On October 15, 2021, Moore was terminated and offered severance pay, in contravention of Defendants' Severance Plan. Ex. O; Ex. UUUU.

**RESPONSE:** This fact is partially disputed. Moore was terminated on October 15, 2021. She was also offered severance. (Farkas Decl., Exs. QQQQ, TTTT, VVVV, WWWW & YYYY.) It is untrue that PPFA contravened its policies by offering severance to Moore. *See* Response to Additional Fact No. 130.

132.    Moore's termination sparked complaints of racism and a lack of commitment to Black audiences amongst her former coworkers. Ex. 17; Ex. 19.

**RESPONSE:** This fact is disputed. Plaintiff cites Exhibits 17 and 19, which do not support the assertion that Moore's termination "sparked complaints of racism and a lack of commitment to Black audiences amongst her former coworkers." Exhibit 17 is a Google Chat between Perez and Galloway on October 20, 2021 after Moore's termination. Perez states: "Wanted to flag that we expect there may be some questions about Nicole." Galloway notes that they cannot "go into details" about the personnel decision other than to explain that it was a "business decision." Exhibit 19 is an email from Garcimonde-Fisher to Newman, which says: "An unpredictable impact of NM's departure is folks thinking that we aren't dedicated to Black History Month." The email then outlines plans to address that concern and reassure anyone who is concerned that the Black History Month work has been reassigned. In short, Exhibits 17 and 19 do not show that there were any "concerns of racism" at PPFA following Moore's termination.

133.    Following Moore's termination, Defendants hired a new Director of Marketing and Brand Engagement, Nathan Engebretson, a white male, in the B&C department, who reported to Perez. Ex. H at 147:22-148:1-11; Ex. F at 181:1-14; Ex. G at 184:19-25-186:1-4; Ex. WWWW.

**RESPONSE:** This fact is partially disputed. Engebretson worked at Planned Parenthood affiliates for nearly 20 years beginning in 2003. He was then hired to join PPFA on the Brand & Culture Department in the spring of 2022, about six months after Moore was terminated. As Moore herself acknowledges, his title was "Director of Marketing and Brand Engagement" whereas her title was "Director of Multicultural Brand Engagement." (Supp. Farkas Decl., Ex. IIII.) Thus, Additional Fact No. 133 is inaccurate when it says

38

that a "new" Director of Marketing and Brand Engagement was hired, because that incorrectly suggests that Engebretson replaced Moore.

134.    The Director of Marketing and Brand Engagement absorbed much of the responsibilities Moore was performing before she was terminated. Ex. WWWW; Ex. 14.

> **RESPONSE:** This fact is disputed. It is true that Engebretson also reported to Perez, given that she ran the Brand Marketing team. No evidence in the record supports the assertion that Engebretson replaced Moore or "absorbed much of the responsibilities Moore was performing[.]" His title, scope, and experiences were completely different. (Perez: 148:9–18.) Even if he absorbed some tasks that Moore had been assigned to perform, so too did others in the Division after her termination.

135.    On November 17, 2021, after Moore's termination, Perez tried to reassign work from one of the observances for which Moore was Owner to Associate Director Nicole Long because she is Black. Ex. 20.

> **RESPONSE:** This fact is disputed, in that it takes Perez's words out of context. The observance at issue was Black History Month. Perez stated: "Let's talk more about how we can staff this observance – for instance, how can we assign Nicole Long to this work [Black History Month] without it being tokenizing? And also, how can we give this work to any of our non-Black staff? #cantwin." (Ex. 20.)

136.    Long recognized Defendants' inequitable distribution of work on account of race, which she found tokenizing and demoralizing, during her tenure of employment with Defendants. Ex. 3 at ⁋ 5.

> **RESPONSE:** This fact is disputed. This assertion is not a "fact" but rather Long's subjective assessment of how work was distributed.

137.    Long observed Defendants holding Black employees to a higher standard than non-Black employees. Ex. 3 at ⁋⁋ 6-7.

> **RESPONSE:** This fact is disputed. This assertion is not a "fact" but rather Long's subjective assessment.

138.    On August 25, 2021, Long lodged a complaint of racism against Defendants to Garcimonde-Fisher and Galloway, who escalated the complaint to Beckett. Ex. 3 at ⁋⁋ 8-9.

**RESPONSE:** This fact is disputed, in that the paragraphs cited in Long's Declaration (Ex. 3) refer to an email that is not in the record, and thus is inadmissible. *See* FRE 1002.

139.    In a meeting to discuss Long's complaint, Beckett screamingly threatened Long with termination and told her she "g[a]ve Black women a bad name." *Id*.

**RESPONSE:** This fact is disputed, in that the paragraphs cited in Long's Declaration (Ex. 3) refer to an email that is not in the record, and thus is inadmissible. *See* FRE 1002.

140.    Garcimonde-Fisher retaliated against Long following her complaint of race discrimination by canceling weekly meetings and ignoring her requests for reasonable accommodation. Ex. 3 at ¶¶ 12-15.

**RESPONSE:** This fact is disputed. It is a legal conclusion that is inappropriate for Rule 56.1 Statements. Moreover, paragraphs 13–15 in Long's Declaration (Ex. 3) refer to an email that is not in the record, and thus is inadmissible. *See* FRE 1002.

141.    Long lodged a second complaint of race discrimination to Defendants' General Counsel Kumiki Gibson, who ignored the complaint. Ex. 3 at ¶ 16-17.

**RESPONSE:** This fact is disputed, in that it constitutes inadmissible hearsay within hearsay. *See* FRE 801, 803, 805.

142.    Defendants took no action in response to Long's complaint to Gibson. *Id*.

**RESPONSE:** This fact is disputed. There is no admissible evidence that Long ever made any such complaint.

143.    Bawol, in consultation with Galloway and Beckett, terminated Director of Video, Rachel Velasquez, for requesting an extension to her medical leave. Ex. 24; Ex. E at 142:3-143:5;144:5-20.

**RESPONSE:** This fact is disputed. Bawol testified that Velasquez's absence was "not the reason she was let go"; rather, Bawol terminated Velasquez's employment for performance reasons that pre-dated her period of leave. (Bawol: 143:10–146:7.) Moreover, this allegation is immaterial to Moore's claims, and thus cannot create a triable issue of fact. *See Joiner v. Am. Red Cross*, No. 02-CV-06520, 2004 WL 1638184, at *11 (W.D.N.Y. July 22, 2004), *aff'd*, 144 F. App'x 896 (2d Cir. 2005) (holding that plaintiff may not use evidence of one type of discrimination to prove discrimination of another type).

144.     Rachel Velasquez filed a charge of disability discrimination and retaliation with the

Equal Employment Opportunities Commission in response to her termination. Ex. 25.

> **RESPONSE:** This fact is disputed. Plaintiff cites to Exhibit 25, which is a chat between Bawol and Garcimonde-Fisher that does not support, or relate to, the assertion contained in Additional Fact No. 144. Regardless, the existence of a charge of disability discrimination would not be relevant to this Motion. *First*, the fact that a different employee filed an unproven complaint with an administrative agency is not proof of anything. *Second*, a complaint of disability discrimination has no factual nexus to this litigation, which involves claims of race discrimination. *See Joiner v. Am. Red Cross*, No. 02-CV-06520, 2004 WL 1638184, at *11 (W.D.N.Y. July 22, 2004), *aff'd*, 144 F. App'x 896 (2d Cir. 2005) (holding that plaintiff may not use evidence of one type of discrimination to prove discrimination of another type).

145.     Moore's coworker, Shirley Cruz, an Afro-Latina woman, has also made complaints

of race discrimination and retaliation and has filed litigation against Defendants. *Cruz v. Planned*

*Parenthood Fed'n of Am.*, 1:23-cv-10932-GHW-JLC (S.D.N.Y. May 2, 2024).

> **RESPONSE:** This fact is partially disputed. It is true that Shirley Cruz filed a complaint against Defendants on December 18, 2023. However, Defendants deny that the existence of a separate litigation is proof of anything or relevant to the Motion. Untested allegations have no legal import.

Dated:   July 2, 2024
         New York, New York

                                        ARENTFOX SCHIFF LLP

                                        */s/ Brian Farkas*
                                        Brian Farkas, Esq.
                                        1301 Avenue of the Americas, 42nd Floor
                                        New York, NY 10019
                                        (212) 492-3297
                                        brian.farkas@afslaw.com

                                        Nancy J. Puleo, Esq. (*pro hac vice*)
                                        800 Boylston Street, 32nd Floor
                                        Boston, MA 02199
                                        (617) 973-6124
                                        nancy.puleo@afslaw.com

Alexandra M. Romero, Esq. (*pro hac vice*)
1717 K Street NW
Washington, DC 20006
(202) 828-3469
Alexandra.romero@afslaw.com

*Attorneys for Defendants Planned
Parenthood Federation of America, Inc. and
Planned Parenthood Action Fund, Inc.*